**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────

**No. 14-1442**

─────────

RENEE PRYOR,

     Plaintiff - Appellant,

   v.

UNITED AIR LINES, INC.,

     Defendant - Appellee.

─────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.    Leonie M. Brinkema, District Judge.  (1:13-cv-01125-LMB-TRJ)

─────────

Argued:  April 8, 2015      Decided:  July 1, 2015

─────────

Before MOTZ and GREGORY, Circuit Judges, and DAVIS, Senior Circuit Judge.

─────────

Vacated and remanded by published opinion.  Judge Gregory wrote the opinion, in which Judge Motz and Senior Judge Davis joined.

─────────

**ARGUED**: Spencer Freeman Smith, SMITH PATTEN, San Francisco, California, for Appellant.  Jody A. Boquist, LITTLER MENDELSON, P.C., Chicago, Illinois, for Appellee.  **ON BRIEF**: Dow W. Patten, SMITH PATTEN, San Francisco, California, for Appellant. Paul E. Bateman, Angela I. Rochester, LITTLER MENDELSON, P.C., Chicago, Illinois, for Appellee.

─────────

GREGORY, Circuit Judge:

This case most centrally concerns the question of when an employer may be held liable for a hostile work environment created by an anonymous actor. Renee Pryor, an African-American flight attendant, alleges that her employer, United Airlines, failed to adequately respond to a racist death threat left in her company mailbox. The district court concluded that Pryor was subjected to a racially hostile work environment, but granted summary judgment to the airline after deciding that it was not liable for the offensive conduct. For the reasons that follow, we vacate the order granting summary judgment and remand for further proceedings.

I.

Pryor joined United Airlines in 1984 and began working out of Dulles International Airport in the early 1990s. In January 2011, she discovered in her company mailbox a paper note claiming to be a "Nigger Tag – Federal Nigger Hunting License," declaring that the holder was "licensed to hunt & kill NIGGERS during the open search hereof in the U.S." J.A. 209. The tag also purported to give "the holder permission to hunt day or night, with or without dogs." Id. A hand-drawn image of a person hanging from a pole or a tree appeared on one corner of the document, along with the words "this is for you." J.A.

2

1947.[1]  The mailbox was in a secure space at the airport, accessible to United employees and others with company authorization.

Pryor was shaken and afraid.  She immediately sought out her supervisor, Richard Reyes, and showed him the racist death threat.  Reyes told Pryor he was "sorry" but that there was "not much" United could do because there were no security cameras covering the area.  J.A. 1948.[2]  Reyes gave Pryor a flight attendant report to fill out and told her that he would give the form – along with the offensive note – to security and the base manager.  Pryor completed the form and gave it, along with the threat, to Reyes.

At the time, United maintained an official Harassment & Discrimination ("H&D") Policy.[3]  The policy provided guidance for supervisors and managers when they received a complaint

---

[1] Although Pryor maintains that the note included the image of a person hanging from a noose, the copy in the record only bears the 'mock license' without the drawing.  It is unclear whether that copy is, in fact, the version that Pryor first received, or if United lost or altered the original (which Pryor alleges).  Pryor continues to claim that the drawing was originally included on the document, and we must accept her version as true at the summary judgment stage, as the district court did.

[2] Reyes, in fact, thought the racist death threat "was a joke."  J.A. 156.

[3] In 2010, a new written policy also took effect, known as the Working Together Guidelines.  But the H&D policy was still active in January 2011, when Pryor received the first note.

3

regarding harassment or discrimination. It instructed such employees to:

> Listen to the allegation and regard it seriously. <u>Contact the Employee Service Center immediately to report the complaint. The ESC will be responsible for initial in-take of the complaint and then forward to an investigative team for investigation and follow-up.</u> The team will also direct you if your participation in the investigation is necessary. If the complaint is determined to be valid after a thorough and impartial investigation, the supervisor will administer appropriate discipline in consultation with the investigative team.
>
> Supervisors and managers are additionally expected to monitor their workplaces to ensure compliance with this harassment and discrimination policy. <u>Any supervisor or manager, who becomes aware of an incident or complaint of harassment or discrimination, whether by witnessing the incident or being told of it, must immediately report it to the ESC.</u>

J.A. 2169 (emphases added).

Despite that policy, Reyes did not contact the Employee Service Center ("ESC"). Instead, he called Mary Kay Panos, the director of Inflight Services at Dulles, to inform her of the incident. Panos was out of the office (it was a Saturday) and told Reyes to put an envelope with the racist threat under her door so she could see it on Monday morning. When Panos found the envelope, she notified Denise Robinson-Palmer, an Operational Manager at Dulles, and instructed her to follow up. Panos, like Reyes, did not contact the ESC, even though she later acknowledged that it would have been proper protocol.

4

As both Panos and Robinson-Palmer were aware, the note left for Pryor was not the first incident of racism reported at United's Dulles facility. In the 1990s, Pryor received a question from an unidentified colleague about rumors circulating among United employees that black flight attendants based out of Dulles were moonlighting as prostitutes during layovers in Kuwait. Both Panos and Robinson-Palmer became aware of these rumors when they resurfaced in 2009-2010. Panos informally looked into the claims, but failed to substantiate them.

Panos and Robinson-Palmer were also both aware that just a few months before Pryor discovered the threat, an apartment advertisement with a racist message on it had appeared in the flight attendants' break room at Dulles. The message on the advertisement stated that "No niggers need apply." J.A. 2182. Pryor never viewed the flyer, but heard about it from co-workers and a supervisor. Although brought to the attention of Panos and Robinson-Palmer, neither documented the incident, conducted any interviews, contacted human resources, or enlisted the help of corporate security. Instead, Robinson-Palmer called the number listed on the ad to try to determine who posted it. When the woman on the other line disclaimed any knowledge of the racist message on the advertisement, Robinson-Palmer "shredded [the flyer], because [she] was so offended by it." J.A. 1340. The supervisor began to monitor the bulletin board and soon

5

discovered a second identical posting. She again shredded it, without taking any additional action.

When Robinson-Palmer then became aware of the racist threat in Pryor's mailbox, she spoke to the flight attendant about it and contacted Michael Folan from Corporate Security. Robinson-Palmer did not contact the ESC. Security conducted no interviews of co-workers and did not preserve any physical evidence or "any hard copy documents concerning the investigation." J.A. 2102. Security also claimed it was "unable to 'brush' for prints as there were no prints of other employees to match them with, and there was no telling how long the item was there, as anyone could have touched it." J.A. 1484-85. In the end, United "was unable to identify a suspect or even a time of placement of the document." J.A. 1484-85.

Corporate security closed its investigation on February 4, 2011. It appears, however, that nobody directly informed Pryor of that development. Increasingly frustrated, Pryor herself called the ESC and another employee hotline on February 16, 2011, to ask about the status of the investigation and express her unhappiness. The ESC referred the matter to Ally Zauner, a human resources manager in Chicago. Zauner made telephone calls to Pryor, her supervisors, and Corporate Security to gather information.

6

Despite the occurrence of a possible hate crime, and a crime that involved a threat of violence at a major airport, United never reported the incident to the police. Instead, Pryor made a police complaint on February 27, 2011, at the Metropolitan Washington Airport Authority.[4] In her police statement, Pryor recounted in part:

> I showed [the note] to [Reyes]. He said we have no cameras so there is not much we can do. I was so stunned. I was hurt and even embarrassed . . . The "Base Manager" never came to me!! The assistan[t] Base [Manager] did say (5 days later) she did hear of the incident. [Reyes] took the letter[,] put it in a large envelope[,] and told me it would be sent to Corporate Security. A lady from some [department] that handles sexual harassment called me Feb. the 18th, 2011. I returned her call Feb. 19th. She said United was busy merging with Continental Airlines and that she handles other types of situations. To say the least I have followed all the procedures United said to do but up until me calling HR in Chicago no one bothered to call me back. . . . I am stressed[,] hurt[,] and I do not feel safe at work. I dread going to my mailbox because I do not know if this person is in wait for me!! I do not feel safe!! . . . I noticed how [supervisors] look at me different now. Mr. Barreta (supr.) has been good to me with his hugs. It took me a long time to get to the [department] in HR!! Why is this! The stress of this matter has changed how I feel at work. I keep wondering why and who. I thought this behavior was not tolerated in any work environment today . . . It also bothers me that I was asked after my Moscow trip "what did I do" to get this in my mailbox. My response is what does a

---

[4] Folan stated in a "case log" that he directed Robinson-Palmer to have Pryor prepare a police report in January. J.A. 219. Robinson-Palmer, however, apparently failed to do so. Folan later told police that he informed Pryor in January that she should file a report. Pryor disputes that assertion.

person have to do to get a note or to be called a racial slur[].

J.A. 2192-93.

When the police first approached Pryor's supervisors, they were greeted with less than enthusiastic cooperation. Panos told the officer "that they were in the middle of a situation and this was not the best time to meet." J.A. 196. As the officer further noted on the relevant incident sheet:

Ms. Palmer and Ms. Panos stated the issue was being handled internally through Corporate Security and Equal Employment Opportunity (EEO) and did not understand why the police [department] was involved. I explained that in the Commonwealth of Virginia the racial note was considered a form of Hate Crime and a Threat. I also informed that MWAA PD should have been notified on the date of the incident. I also informed that Ms. Pryor did not feel that United Airlines was handling the situation and felt that her job was unsafe. At that time, all the supervisors filled out the Statement of Facts form.

J.A. 196.

Pryor spoke to Zauner again after filing the police report. During that conversation, Zauner received "very limited" details and believed that Pryor "did not want to really share a lot of information with me, unfortunately." J.A. 1512. Pryor did suggest to Zauner that United should send out an email warning employees that "this type of behavior would not be tolerated," and implement a program to encourage employees to "treat each other with respect." J.A. 1960. In the end, Zauner could not identify suspects, and she concluded that the incident was

8

isolated. Notably, Panos and Robinson-Palmer did not inform Zauner of the racist flyers which had been posted a few months earlier, or the prostitution rumors.

On March 25, 2011 – two and a half months after Pryor discovered the racist death threat – Panos sent a "must-read" email to Dulles-based employees. J.A. 1612. The email informed the employees that the company was investigating unspecified "inappropriate and offensive material," and it instructed them to notify a manager if they had any knowledge regarding the unspecified activity. J.A. 1612. Panos also contacted Pryor to tell her that she believed the email would "discourage any future behavior." J.A. 1194. Shortly thereafter, Zauner concluded that although the racist threat "did not align with . . . [the] Working Together Guidelines," she could not "substantiate that somebody had violated the Harassment and Discrimination Policy." J.A. 2083-84. Zauner wrote a letter to Pryor informing her of the findings and explaining that the investigation was being closed. The police department also suspended its investigation "pending the development of further leads." J.A. 2189.

Months later, on October 21, 2011, Pryor received a nearly identical racist death threat in her United mailbox at Dulles, also purporting to be a license to hunt and kill African-Americans. Pryor went immediately to the nearest supervisor,

9

Sandra Sales, who largely ignored her entreaties. Pryor then showed the note to Reyes. Reyes asked to keep it, but Pryor said that she wanted to take it to the police. Crying, Pryor went upstairs to call her aunt and tell her about the threat. Shortly thereafter, a pilot walked by and Pryor showed him the note and explained where she found it. The pilot went to "get someone downstairs" to help, and he brought Reyes up to speak with Pryor again. J.A. 1141. Reyes told Pryor that he had already called Panos and told her what happened. Pryor then took the note to the police station and filed a new report.

Two or three days later, Panos called Pryor at home to discuss the incident. Pryor asked why there were no cameras in the facility, and Panos mentioned the cost of installation. Panos also scheduled a meeting with Pryor and George Bellomusto, who at the time was United's Human Resources Manager at Dulles. During that meeting, Bellomusto gave Pryor a letter to sign about the confidentiality of the investigation. Pryor refused to sign it. The HR manager nonetheless promised to do a thorough investigation.

Pryor also emailed corporate security and filed another complaint with United's ESC. She told the ESC that she was "hurt and afraid," and asked "if something could be done about it." J.A. 1159. Charles Miller from Corporate Security reviewed Pryor's email to that department. Miller referred the

10

matter to a colleague for "follow-up investigation." J.A. 1468. Miller also called Pryor to let her know that they were "taking it seriously" and to tell her that she should contact him or Bellomusto with any questions. Id.

During this time period, the same racist threat was discovered by four other senior African-American flight attendants in their mailboxes. Subsequent daily audits of the mailboxes revealed copies left for five more employees. On October 31, Bellomusto sent an email to supervisors and HR personnel, letting them know of the notes that had been found. One of the other flight attendants, the email stated, was very concerned because fingerprints were not kept on file. Bellomusto expressed his hope that the police would be able to help.

Ten days later, through collaboration with the police, United installed two temporary security cameras in the mailbox area. The cameras, however, did not capture any relevant information, and Bellomusto closed the investigation on or about November 15 after failing to identify suspects. A month later, Bellomusto informed Pryor of the measures the company had taken to prevent future incidents. United also worked with the police to record the fingerprints of all United employees known to have touched the notes to narrow the field of potential suspects if subsequent dusting yielded any evidence.

Pryor relocated to George Bush Intercontinental Airport in Houston. She has not reported any further race-related incidents, nor does the record contain evidence of any additional incidents.

On March 9, 2012, Pryor filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging that United failed to adequately investigate the prostitution rumors and racist notes left in her mailbox, and that the failure constituted unlawful discrimination. She received a right-to-sue letter and timely filed the instant action. Pryor's First Amended Complaint includes three counts, each premised on the set of facts described above.[5] Count I alleges that United "engaged in a systemic pattern and practice of unlawful racial discrimination" through its failure to investigate Pryor's complaints, in violation of 42 U.S.C. § 1981. Counts II-III allege that United created a hostile work environment based on the speculation regarding the prostitution ring and the two notes received, in violation of 42 U.S.C. § 2000e.

---

[5] A quasi companion case was also filed by two of Pryor's colleagues. See Johnson v. United Airlines, Inc., No. 1:13-CV-00113, 2013 WL 3990789 (E.D. Va. Aug. 2, 2013), appeal dismissed, No. 13-2053 (4th Cir. Dec. 12, 2013). The district court in Johnson granted summary judgment for United after finding that neither of the plaintiffs had actually "received the Hunting License . . . or viewed it personally." Id. at *4.

United moved for summary judgment on all three counts. On April 16, 2014, the district court granted the company's motion. Although the court determined that the racist notes were sufficiently severe to create a hostile work environment, it concluded that the conduct could not be imputed to United.

Pryor timely appealed.

## II.

We review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to the non-moving party (Pryor) and drawing all reasonable inferences in her favor. EEOC v. Cent. Wholesalers, Inc., 573 F.3d 167, 174 (4th Cir. 2009). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is inappropriate, however, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## III.

Pryor alleges that she was subjected to a racially hostile work environment, contravening the Civil Rights Act of 1866, 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, 42

13

U.S.C. §§ 2000e to 2000e-17.[6]  The elements an employee must prove are the same under either provision.  Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001).  To survive summary judgment, Pryor must show that a reasonable jury could find that the conduct she alleges was (1) unwelcome; (2) based on her race; (3) sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive work environment; and (4) imputable to her employer.  Okoli v. City of Baltimore, 648 F.3d 216, 220 (4th Cir. 2011); see also Boyer-Liberto v. Fontainebleau Corp., --- F.3d ---, 2015 WL 2116849, at *9 (4th Cir. May 7, 2015) (en banc).

The first two elements – that the conduct at issue was unwelcome and based on race – are not in dispute here.  The parties, however, disagree about whether the conduct was sufficiently severe to create a hostile environment, and whether

---

[6] The Civil Rights Act of 1866 prohibits race discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  Title VII, meanwhile, prohibits employers from "discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Workplace harassment that sufficiently alters the terms and conditions of employment is actionable under a "hostile work environment" theory.  See Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003).

14

liability can be imputed to United.  We consider each question in turn.

A.

A violation of Title VII occurs when an employee's "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted).  To make that showing, a worker must demonstrate that "the environment would reasonably be perceived, and is perceived, as hostile or abusive," even if it is not actually "psychologically injurious." Id. at 22.  We determine the "objective severity of harassment . . . from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (internal quotation marks omitted).

Our inquiry into the severity of unwelcome conduct "is not, and by its nature cannot be, a mathematically precise test." Harris, 510 U.S. at 22.  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted).  But as

15

we have recently confirmed, "an 'isolated incident[]' of harassment can 'amount to discriminatory changes in the terms and conditions of employment,' if that incident is 'extremely serious.'" Boyer-Liberto, 2015 WL 2116849, at *10 (alterations in original) (quoting Faragher, 524 U.S. at 788).

Here, Pryor alleged in her complaint that both the prostitution rumors and mailbox threats engendered a hostile work environment. The district court concluded that although the prostitution rumors were not severe or pervasive enough to create a hostile environment, the racist death threats were sufficient by themselves. On appeal, Pryor does not contest the court's findings regarding the prostitution rumors. United, meanwhile, argues that a hostile environment cannot arise from two notes that it characterizes as isolated, infrequent, and anonymous.

We agree with the district court's determination that although the notes may not have been pervasive, "a reasonable jury could find that [they] were sufficiently severe to alter the conditions of plaintiff's employment" and create a hostile work environment. Pryor v. United Airlines, Inc., 14 F. Supp. 3d 711, 721 (E.D. Va. 2014). Four considerations support that conclusion. First, the use of "the word 'nigger' is pure anathema to African-Americans," Spriggs, 242 F.3d at 185, as it is to all of us. As the district court elaborated, the "[u]se

16

of that word is the kind of insult that can create an abusive working environment in an instant, see Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993), and is degrading and humiliating in the extreme, see Walker v. Thompson, 214 F.3d 615, 626 (5th Cir. 2000)." Pryor, 14 F. Supp. 3d at 720.

Second, as the district court also persuasively reasoned, the offensive language was made still more severe "by virtue of the presence of a clear element of violence" manifested by the threats inherent in a "hunting license" and the image of a lynching. Id. at 721. Indeed, the content of the notes is simply chilling, purporting to give permission for the hunting of a race of human beings "with or without dogs." The "license" thus "clearly implicates the express purpose of killing, the additional implication that the recipient is a sub-human object to be hunted, and the allusion to lynching." Id.

Third, the location where Pryor discovered the threats added to their gravity. They were left in a secure mailroom at a major airport – a space with access ostensibly limited to co-workers and others with company authorization. In an age of unparalleled attention paid to the security of air travel, a death threat left for an airline employee in a secure, restricted space should have been viewed with heightened concern. Further, Pryor's work as a flight attendant left her

17

in a particularly vulnerable position, flying internationally and coming into contact with hundreds of strangers daily. And if there was any doubt, the record includes ample evidence that Pryor was subjectively terrified after receiving the threats.

Fourth and finally, the context of the notes matters. In addition to the two threats that Pryor directly received, the record includes evidence of (1) the same threats left for several other flight attendants, (2) the racist message written on the two apartment advertisements, of which Pryor was aware; and (3) the racially-tinged prostitution rumors. While not severe enough on their own to subject Pryor to a racially hostile work environment, such facts contribute to our evaluation of the severity of the two threats Pryor received. See Spriggs, 242 F.3d at 184 (observing that a hostile work environment analysis looks not only to conduct directed specifically at an individual but also to "the 'environment' of workplace hostility").

In sum, the conduct at issue in this case is far removed from the mere off-hand comments or teasing that courts have found of insufficient severity to engender a hostile environment. See Faragher, 524 U.S. at 788. As the district court properly concluded, "a reasonable jury could properly construe the notes as racially-tinged death threats so severe

18

that it does not matter that they were not pervasive." Pryor, 14 F. Supp. 3d at 721.

## B.

The question of United's liability for the anonymous harassing conduct is a closer one. On one hand, employers are not strictly liable for acts of harassment that occur in the workplace. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 72 (1986); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998). Indeed, instances of anonymous harassment pose unique challenges to companies that must work both to identify the perpetrator and to protect victims from a faceless, though ominous, threat. But on the other hand, an employer maintains a responsibility to reasonably carry out those dual duties of investigation and protection. The anonymous nature of severe threats or acts of harassment may, in fact, heighten what is required of an employer, particularly in circumstances where the harassment occurs inside a secure space accessible to only company-authorized individuals.

As we have held, an employer may be liable for hostile work environments created by co-workers and third parties "if it knew or should have known about the harassment and failed to take effective action to stop it . . . [by] respond[ing] with remedial action reasonably calculated to end the harassment." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 319 (4th Cir. 2008)

(internal quotation marks omitted) (emphasis added); see also Freeman v. Dal-Tile Corp., 750 F.3d 413, 423 (4th Cir. 2014); EEOC v. Xerxes Corp., 639 F.3d 658, 669 (4th Cir. 2011). An employer is not subject to a lesser standard simply because an anonymous actor is responsible for the offensive conduct. See Xerxes, 639 F.3d at 672-73 (holding an employer to the same standard for responding to harassment carried out by known and unknown individuals); Cerros v. Steel Techs., Inc., 398 F.3d 944, 951 (7th Cir. 2005) (noting that a plaintiff's "inability to verify the authorship of . . . racist graffiti poses no obstacle to his establishing that this graffiti produced or contributed to a hostile work environment"). Instead, the fact of anonymity is a circumstance that helps inform our determination of whether a company's response was reasonably calculated to end the harassment at issue. See Tademy v. Union Pac. Corp., 614 F.3d 1132, 1149 (10th Cir. 2008) ("Although there may be difficulties with investigating anonymous acts of harassment, those difficulties at most present factual questions about the reasonableness of [the employer's] response . . . .").

The parties here do not dispute that United knew about the two racist death threats Pryor received (in addition to the prostitution rumors and the bulletin board apartment advertisements). Further, Pryor agrees that United's response to the second threatening note she received was adequate. The

20

only question is thus whether the airline's actions in response to the first threat were prompt and reasonably calculated to end the harassment. See Freeman, 750 F.3d at 423.

Of course, the reasonableness of a company's actions depends, in part, on the seriousness of the underlying conduct. See Xerxes, 639 F.3d at 675-76 (examining whether a company's response was proportional to the seriousness of the incidents of harassment); Ellison v. Brady, 924 F.2d 872, 882 (9th Cir. 1991) (observing that "remedies should be assessed proportionately to the seriousness of the offense" (internal quotation marks omitted)); Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 309 (5th Cir. 1987) (looking to the severity of alleged sexual harassment to determine the adequacy of a company's response). It is only in light of the nature of the harassment that we can see whether a company's response was proportional by examining the promptness of any investigation, the specific remedial measures taken, and the effectiveness of those measures. See Xerxes Corp., 639 F.3d at 669-70.

As previously described, the conduct at issue in this case is some of the most serious imaginable in the workplace – an unmistakable threat of deadly violence against an individual based on her race, occurring in the particularly sensitive space of an airport. By its own terms, the note Pryor received was not only a threat to her but to all African-American employees

21

who shared the same space.  It is also reasonable to infer on this record that the perpetrator was someone United had entrusted with access to the mailroom.

Given the severity of the threat, a reasonable jury could find that United's response was neither prompt nor reasonably calculated to end the harassment.  United supervisors did not call police, even though police later suggested that they should have.  They did not escalate the matter to the ESC, in apparent violation of the company's H&D policy.[7]  They did not inform corporate security of the racist message on the fliers previously discovered in the break room.  They did not promptly install cameras or other monitoring devices.  They did not provide Pryor with additional security or protective measures. They did not obtain fingerprints, do other forensics analysis, or interview co-workers.  And they remarkably did not inform Pryor when their investigation closed, an event that occurred without management having sent any correspondence to employees to solicit information and/or put them on notice that the company was being vigilant in monitoring the workplace.  In short, a reasonable jury could find that United had done very

---

[7] Clearly, a company's failure to follow an internal policy does not make its response unreasonable as a matter of law.  But insofar as a company's policies reflect its reasoned belief as to the best way to address and end harassing conduct, compliance with those policies is a factor we may consider.

little to deter future acts of harassment up until the time that the airline initially closed its investigation.

Tellingly, Pryor herself had to both call the ESC to resurrect the investigation and report the incident to police. Were it not for Pryor's actions, it is reasonable to infer that no email would have ever gone out to United employees – an email that Panos sent more than a month after Pryor contacted the ESC. And after the ESC became involved, Panos and Robinson-Palmer failed to inform the investigating HR manager of prior instances and allegations of racism at United's Dulles facility. A reasonable jury could find that such an omission contributed to the manager's conclusion that the first note Pryor received represented an isolated occurrence.

As for United's interaction with the police, when an officer first interviewed Panos and Robinson-Palmer, she was met with less than generous cooperation. In fact, before the officer could even explain her presence, the managers told her that it was "not the best time to meet" and questioned whether she should have made an appointment. Curiously, Panos and Robinson-Palmer further indicated that they "did not understand why the police [department] was involved." J.A. 196. Such initial antipathy to police involvement stands in informative contrast with the active cooperation advocated by Human

23

Resources Manager George Bellomusto in the aftermath of the discovery of the second note.

It is also significant, albeit not dispositive, that United's response to the first threat was ineffectual in stopping the harassing conduct, as the notes reappeared months later in greater number. The mere fact that a company's strategy was not successful does not necessarily mean the strategy was not a reasonably calculated one. <u>Xerxes</u>, 639 F.3d at 669-70. Yet the effectiveness of an employer's actions remains a factor in evaluating the reasonableness of the response. <u>See</u> <u>Cerros</u>, 398 F.3d at 954 (observing that "the efficacy of an employer's remedial action is material to our determination whether the action was reasonably likely to prevent the harassment from recurring" (internal quotation marks omitted)). On this record, a reasonable jury could find a causal relationship between United's lukewarm initial response to the threat Pryor received and the later reappearance of the notes.

In granting summary judgment for United, the district court reasoned that there were no grounds to think that the perpetrator would have been found even if the airline had taken additional steps. <u>Pryor</u>, 14 F. Supp. 3d at 723 ("[T]here is absolutely no basis in the record to conclude that plaintiff's preferred route would have led defendant to the culprit."). But

24

that logic miscalibrates the test for employer liability and fails to view the evidence in the light most favorable to Pryor. A plaintiff in a hostile work environment case does not bear the burden of making the speculative showing that taking different measures would have necessarily stopped the harassing conduct at issue. Instead, the focus of our inquiry rests on whether the means that a company chose were "reasonably calculated" to end the harassment. That is, even if a diligent response may not have been successful, a company is not thereby excused for its lack of diligence.

Even using the district court's logic, a reasonable jury could find that a more immediate and robust response to the first threatening note would have increased the chances of identifying suspect(s) while deterring the later proliferation of notes. Any number of actions could have been effective, including reporting the incident immediately to the police, conducting interviews with co-workers and others with access to the mailroom, and promptly sending correspondence about the incident to Dulles-based employees.

We need not, and indeed could not, prescribe exactly what United's response to the first note should have been. There were, no doubt, multiple ways for the company to reasonably respond. It also bears emphasizing that an employer's response need not be perfect, or even embody best practices, to be

25

considered reasonably calculated to end harassing conduct. Mikels v. City of Durham, N.C., 183 F.3d 323, 330 (4th Cir. 1999) (holding that an employer's "particular remedial responses" need not be the "most certainly effective that could be devised"). We can, however, confidently say on this record that a reasonable jury could conclude that the response United actually chose was neither prompt nor reasonably calculated. Indeed, a reasonable jury could find that United's response was instead reluctant and reactive, intended to minimize any disruption to day-to-day operations instead of identifying a perpetrator and deterring future harassment.

We therefore vacate the district court's award of summary judgment and remand for further proceedings consistent with this opinion.

VACATED AND REMANDED