**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 18-2420**

CYBERNET, LLC; ALADDIN REAL ESTATE, LLC,
–
        Plaintiffs – Appellants,

v.

JONATHAN DAVID, in his personal capacity and his official capacity as District Attorney for the 13th Prosecutorial District of North Carolina; JAMES MCVICKER, in his personal capacity an in his official capacity as Sheriff of Bladen County, North Carolina; TRAVIS DEAVER, in his personal capacity and his official capacity as a Deputy Sheriff of Bladen County, North Carolina,

        Defendants – Appellees.

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. Robert Boyd Jones, Jr., Magistrate Judge. (7:16-cv-00016-RJ)

Argued: January 28, 2020            Decided: March 24, 2020

Before GREGORY, Chief Judge, and WILKINSON and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Gregory and Judge Wynn joined.

**ARGUED:** Keith P. Anthony, Raleigh, North Carolina, William J. Brian, Jr., MORNINGSTAR LAW GROUP, Durham, North Carolina, for Appellants. Patrick Grayson Spaugh, WOMBLE BOND DICKINSON (US) LLP, Charlotte, North Carolina; James Wellner Doggett, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh,

North Carolina, for Appellees. **ON BRIEF:** Christopher J. Geis, WOMBLE BOND DICKINSON (US) LLP, Winston-Salem, North Carolina, for Appellees James McVicker and Travis Deaver.

WILKINSON, Circuit Judge:

This case concerns the execution of search warrants at two video sweepstakes stores in North Carolina owned or operated by appellants Cybernet, LLC and Aladdin Real Estate, LLC (hereinafter Cybernet). In the course of these searches, the deputies executing the warrants caused some damage, the nature and extent of which the parties continue to debate. As a result of this damage, Cybernet brought several state and federal claims in state court. Relevant for this appeal, it sued three state officials under 42 U.S.C. § 1983 for directing or participating in the unlawful destruction of its property in violation of the Fourth Amendment. Those defendants are the appellees here—Deputy Sheriff Travis Deaver, Sheriff James McVicker, and District Attorney Jonathan David. The defendants promptly removed the case to the United States District Court for the Eastern District of North Carolina.

That court, in turn, issued two rulings that are the subject of this appeal. First, the court denied Cybernet's motion to compel testimony concerning David's role in the searches because this testimony was irrelevant or cumulative of other testimony. Second, it granted the defendants summary judgment on the grounds that David and McVicker were only tangentially involved with the searches and because the damage that Deaver allegedly caused was minimal and incidental to the lawful seizure of items within the warrant's scope. We conclude that, taken as a whole, the items seized were within the parameters of the search warrant and any incidental damage that took place is not indicative of the kind of gratuitous damage that would exceed Fourth Amendment bounds. Because we hold that no violation of the Fourth Amendment occurred, and that the requested discovery would

3

accordingly serve no purpose, we affirm the judgment.

## I.

## A.

Holly and Jeffrey Smith operate two video sweepstakes stores, where customers can play electronic games in exchange for prizes. The stores, Big Aladdin and Little Aladdin, are located across the street from one another in Bladen County, North Carolina. Cybernet owns the stores and leases the space for them from Aladdin Real Estate. The Smiths own both Cybernet and Aladdin, which are the appellants in this case.

In early 2015, the Bladen County Sheriff, James McVicker, suspected the stores of violating a state law that bans video sweepstakes wherein chance predominates over skill. McVicker and one of his deputies, Captain Jeffery Tyler, met with county District Attorney Jonathan David to discuss opening an investigation. After this meeting, Captain Tyler took the reins, recruiting David Borresen—an undercover sheriff's deputy—to assist with the investigation. Borresen visited Big and Little Aladdin a few times in May 2015 and played some of the sweepstakes games to check out their legality.

Armed with Borresen's undercover findings of alleged illegality, Captain Tyler applied for search warrants for Cybernet's stores. These warrants, issued on May 28, 2015, authorized officers to seize various items, including gaming machines and the financial proceeds thereof, related documents, photographs, videos, and electronic media, as well as other "fruits and instrumentalities" of the alleged crimes. J.A. 44-63, 2455.

The next day, the Bladen County Sheriff's Office held an operational briefing to discuss the warrants' execution. At that meeting, Captain Tyler distributed a memorandum

4

reminding officers to "***Be professional, remember people are watching and cameras will be everywhere.***" J.A. 2455 (emphasis in original). Sheriff McVicker was also present for a portion of this meeting. According to Cybernet, McVicker directed his deputies to "take every[] [f***ing] thing out." J.A. 2353. McVicker, for his part, denies this and alleges that he reminded his deputies to be professional. *See* J.A. 2456 n.1.

Later that afternoon, Big and Little Aladdin were searched. Cybernet alleges that each of the three appellees were present. Deputy Deaver was part of the sixteen-person crew executing the search, Sheriff McVicker arrived at some point after the search began, and, as for DA David, a contractor working for the Smiths alleges that he saw David on site. No other witnesses, however, saw David there, and he is not listed on the crime scene log. By all accounts, two individuals from his office were present as observers.

A few points about the search bear mention. To begin with, officers took steps to secure the premises upon their arrival, telling customers to leave and redirecting the security cameras upward. They then seized evidence from inside and outside the shops. For example, Deputy Deaver was directed to collect the security cameras on Big Aladdin's rooftop. Because those cameras were mounted on two-by-fours, Deaver removed them by pulling the planks from the roof. He also removed LED lighting from tracks attached to the roof but did not seize the lighting and left it on the ground.

The lion's share of the seized evidence, however, came from inside the shops. Officers took with them, among other items, a number of computer monitors, sweepstakes kiosks, boxes of cords and computer parts, and televisions. *See* J.A. 1229-32 (cataloguing the inventory of seized items). The number of items removed traced to the fact that

5

Cybernet was a large operation. There is no indication that any of these items were damaged. Notably, because one of the seized televisions was out of reach, a deputy stood on a wooden table to remove it. The table gave out under his weight.

Neither of the Smiths was present during the searches, but Mr. Smith arrived at the stores minutes afterward. After surveying his properties, Mr. Smith alleged the following: (1) the LED lighting, portions of the plastic track for the lighting, and the points on the stucco exterior where the track was affixed to the lighting were damaged; (2) wiring on the roof used for the security cameras was yanked or cut; (3) the seal of a conduit allowing wires to pass through the roof was compromised, allowing water to intrude and damage part of a ceiling; (4) an adhesive mural or window sticker depicting the Las Vegas skyline was removed from the window of Big Aladdin and placed in the trash; (5) computer, television, and ice-machine wiring and cables were cut; (6) internal wiring for magnetic locks on the front door to Big Aladdin was cut; and (7) the wooden table in Little Aladdin was broken. *See* J.A. 2458-59. Three days after the searches, Mr. Smith reported a fire at Big Aladdin that damaged the LED lighting's power supply. *Id.* at 2459. This, he believed, was caused by the way the security cameras were removed from the roof.

The Smiths were ultimately arrested and charged with twenty counts relating to their operation of Big and Little Aladdin. The DA's Office in the Smiths' view sought "very high bond amounts" for their release. Appellants' Op. Br. at 16. According to the Smiths, these actions were yet another chapter in their longstanding and acrimonious relationship with DA David. In their view, David had been unfairly targeting them for prosecution for years because he had taken the stance that "all electronic sweepstakes and reward

6

promotions are illegal"—irrespective of what state law actually proscribes. *Id.* at 14-15. What's more, Sheriff McVicker's prior history with the Smiths put him in the middle of the crossfire. Specifically, the Smiths purportedly donated large sums of money to McVicker during his election campaign for Sheriff on the implicit promise that he would not target their businesses if elected. Rather than keep his word, the Smiths contend, McVicker agreed to investigate their stores at David's behest to avoid political embarrassment.

B.

Cybernet filed suit in state court on January 8, 2016. It sued DA David, Sheriff McVicker, and Deputy Deaver under 42 U.S.C. § 1983 for violating Cybernet's rights under the Fourth, Fifth, and Fourteenth Amendments, claiming that defendants, herein the appellees, used or directed others to use excessive force on Cybernet's property during the execution of the warrants. Cybernet also lodged several other federal and state law claims. Then, on February 2, 2016, the case was removed to the United States District Court for the Eastern District of North Carolina.

When discovery commenced, Cybernet filed a motion to compel testimony from two assistant district attorneys in David's office. Specifically, it sought information related to David's involvement with the execution of the warrants and his alleged malice toward Cybernet. The district court denied the motion. It reasoned that the requested testimony was irrelevant to the claims and defenses, not proportional to the needs of the case, or cumulative. J.A. 887.

On the heels of this order, defendants each moved for summary judgment on all

7

claims. Following extensive briefing, the trial court, on November 2, 2018, granted the motions as to all federal claims and remanded the state law claims back to state court. J.A. 2451-94. Relevant here are the trial court's rulings on the Fourth Amendment excessive force claims against the individual defendants. With regard to these claims, Cybernet seeks to hold David and Deaver liable in their individual capacities and McVicker in both his individual and official capacities. The court granted defendants qualified immunity across the board, reasoning as follows.

First, as to David, the court determined that Cybernet "fail[ed] to demonstrate a genuine issue that David, or any member of the District Attorney's Office, violated [Cybernet's] constitutional rights by instigating, directing, or supervising the search and the destruction of [Cybernet's] property." J.A. 2472. Second, as to McVicker, the court concluded that there was no evidence showing that he damaged Cybernet's property and the evidence that he directed his deputies to do so, personally or as a matter of municipal policy, was "too speculative" to create a genuine issue of fact. J.A. 2480-82. Third and finally, because Deaver "acted no more than negligently" when he removed the LED lighting by unclipping it from tracks attached to Big Aladdin's roof, and because "clearly established law allows for some damage incidental to the execution of a search warrant," he, too, could not be found liable. J.A. 2488.

This appeal followed. Cybernet challenges the trial court's conclusions as to the individual defendants and asserts as well that the execution of the search warrants, when taken in its totality, exceeded Fourth Amendment bounds. Only Fourth Amendment claims concern us, as Cybernet has waived its other federal claims by failing to assert them on

8

appeal. *See Hensley v. Price*, 876 F.3d 573, 580-81 n.5 (4th Cir. 2017).

## II.

### A.

We review the district court's grant of summary judgment on the Fourth Amendment claims de novo. *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495 (4th Cir. 2015). A grant of summary judgment is proper when no genuine dispute of material fact exists for trial. *Id.* (citing Fed. R. Civ. P. 56(a)). In making this determination, we view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Pryor*, 791 F.3d at 488. That said, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982) (quotation omitted).

Here, Cybernet may not survive summary judgment on its claims unless the facts, viewed in the light most favorable to it, make out a Fourth Amendment violation. Put otherwise, none of the appellees may ultimately be held liable—for either damaging Cybernet's property or directing others to do so—if no unconstitutional harm to property has actually occurred. It is to that question that we now turn.

### B.

The great majority of cases dealing with the right of the people "to be secure in their persons, houses, papers, and effects," U.S. Const. amend. IV, have dealt with the showing necessary for agents and officers of the state to enter upon an individual's premises or

9

dwelling. The emphasis of the Amendment has been upon the need for officers to get a warrant, the requirement of probable cause, and the descriptive material within the warrant itself. That does not mean, however, that the protections of the Amendment somehow vanish once officers lawfully set foot inside the door. The great abuses of totalitarian states involve the wanton destruction of property, not simply the unauthorized entry upon it. One need only recall the horrors of Kristallnacht to have a sobering example. *See* Sir Martin Gilbert, *Kristallnacht: Prelude to Destruction* (2006).

In the execution context, as elsewhere, Fourth Amendment reasonableness kicks in. The basic idea is to encourage officers to get warrants and to work within their terms in executing them. To be sure, the Fourth Amendment generally leaves it "to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Dalia v. United States*, 441 U.S. 238, 257 (1979). A degree of latitude is fitting—in fact, necessary—because not all searches are alike: What is reasonably necessary to execute a search warrant tracks the nature and quantity of the evidence to be seized. Illegal substances often will be hidden; stolen goods may be stored to escape the eye; and the relevance of complex business records may not be obvious at first blush. Because "the needs of any given search will vary," some flexibility in the execution of a warrant is appropriate. *Gardner v. Evans*, 920 F.3d 1038, 1050 (6th Cir. 2019).

Built into this flexibility is a recognition that, during the course of a search, incidental damage to property may occur. The Supreme Court has recognized that "officers executing search warrants on occasion must damage property in order to perform their

10

duty." *Dalia*, 441 U.S. at 258. This is not at all to suggest that officers may ransack premises at will. Thus it follows that the "excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment" and serve as a basis for liability under 42 U.S.C. § 1983. *United States v. Ramirez*, 523 U.S. 65, 71 (1998).

Whether property damage is constitutionally excessive is most comfortably assessed under a standard of objective reasonableness. This choice naturally flows from the Supreme Court's recognition that "Fourth Amendment reasonableness is predominantly an objective inquiry." *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (quotation omitted). In fact, the Court has "almost uniformly rejected invitations to probe subjective intent." *Id.* at 736-37. The benefits of an objective inquiry are at least two-fold: It "recognizes that the Fourth Amendment regulates conduct rather than thoughts, and it promotes evenhanded, uniform enforcement of the law." *Id.* at 736 (citations omitted).

Such an approach makes good sense here. We need look no further than *Graham v. Connor*, where the Supreme Court considered what standard to apply to a Fourth Amendment excessive force claim for the seizure of a person. 490 U.S. 386 (1989). The Court held: "As in other Fourth Amendment contexts . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Intuitively, what goes for the seizure of a person should also apply to the seizure of his property. It would be odd if an officer's "evil intentions" could not be considered when he effectuates a seizure of a person, *id.*, but could be considered when he takes that person's things. Thus, we hold that

11

an officer's conduct does not violate the Fourth Amendment if the destruction of property is, as an objective matter, reasonably necessary to execute a lawful search warrant. *See Johnson v. Manitowoc Cty.*, 635 F.3d 331, 335 (7th Cir. 2011) (applying the rule set out in *Graham* to a § 1983 claim for excessive force as to property under the Fourth Amendment).

This standard works in harmony with the law of qualified immunity, which shields government officials "from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018) (internal quotation marks and quotation omitted). Our court has "consistently conducted an objective analysis of qualified immunity claims and stressed that an officer's subjective intent or beliefs play no role." *Brown v. Elliott*, 876 F.3d 637, 644 (4th Cir. 2017) (quotation omitted). Specifically, to defeat a qualified immunity defense, a plaintiff must show that "(1) the defendant violated the plaintiff's constitutional rights, and (2) the right in question was clearly established at the time of the alleged violation." *Adams*, 884 F.3d at 226. The above discussion makes plain that, when addressing a Fourth Amendment claim for the excessive destruction of property, a standard of objective reasonableness underlies both of these determinations.

Two core principles bear on whether an officer can be held liable for damaging a plaintiff's property while executing a search warrant. To start, because officers are afforded a degree of discretion in determining how to carry out a search, they are not required to "use the least possible destructive means to execute a search warrant." *Johnson v. Manitowoc Cty.*, 635 F.3d 331, 335 (7th Cir. 2011). So long as a given use of force is

objectively reasonable under the totality of the circumstances, it is not dispositive that, in hindsight, the search could arguably have been conducted in a less destructive way. *Id.* (holding that the use of a jackhammer to gather evidence from a concrete floor was not unreasonable, even though the use of a diamond or carbide-bladed saw may have resulted in less damage).

Further, it is *excessive* damage to property that is objectively unreasonable—a principle that, we reiterate, the Supreme Court has long recognized. *United States v. Ramirez*, 523 U.S. 65, 71 (1998) (stating that the "excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment"). In determining what is considered "excessive" damage, we look to the ordinary meaning of the term. *See* Oxford English Dictionary (2d ed. 1989) (defining excessive as "[e]xceeding what is right, proportionate, or desirable; immoderate, inordinate, extravagant"). As applied here, this definition implies something more than accidental or incidental injury to property in the course of working within the parameters of a lawful search warrant. Accidents happen. Unfortunate as they may be, such mishaps need not dictate Fourth Amendment liability. *See Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1989).

## III.

With these principles in mind, we consider Cybernet's argument that the search warrants at issue were executed in an objectively unreasonable manner. According to Cybernet, the searches of Big and Little Aladdin caused "extensive property damage." Appellants' Op. Br. at 5. None of this damage was constitutional, it adds, because "the search warrants could have been executed without damaging [Cybernet's] property in this

13

manner, which is evidence that the harm was purposeful and gratuitous." *Id.* at 28.

## A.

We cannot conclude that the totality of the alleged damage in this case rises to the level of a Fourth Amendment violation. For starters, taking all the alleged damage as a given, it was not negligible, but neither was it major. As the district court put it, "cases where courts have denied qualified immunity generally involve greater levels of destruction of property than what is alleged here." *See* J.A. 2486; *see, e.g.*, *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 974 (9th Cir. 2005) ("In executing the warrants, the officers cut the mailbox off its post, jack-hammered the sidewalk outside the clubhouse, and broke the [plaintiff's] refrigerator."); *Gary M. v. City of N. Charleston*, No. 2:16-CV-01087-DCN, 2017 WL 4236542, at *2 n.2, *5 (D.S.C. Sept. 25, 2017) (denying summary judgment for defendants in light of evidence that SWAT team destroyed laptop, television, sofa, washing machine, bed and bedframe, door frame, CPAP machine, coffee table, and swivel chair, and left glass all over the floor); *Jackson ex rel. Jackson v. Suffolk Cty.*, 87 F. Supp. 3d 386, 402 (E.D.N.Y. 2015) (photos taken by plaintiffs showed "flipped and cut furniture, a disassembled coat rack, property strewn across the floor of the basement, damage to ceramic bowls and a bird feeder stand, damage to picture frames, a scratched end table, and marks to backs of leather furniture").

Further, the cases are legion finding no liability where officers caused *more* extensive damage than what is claimed in this case. *See, e.g.*, *United States v. Becker*, 929 F.2d 442, 447-48 (9th Cir. 1991) (the use of a jackhammer to break apart concrete on defendant's property was not unreasonable); *Brown v. City of Utica, N.Y.*, 854 F. Supp. 2d

14

255, 262 (N.D.N.Y. 2012) (no Fourth Amendment violation where alleged damage included "a cracked glass cabinet door, a closet door off its hinges, garbage strewn outside the home" and "a radiator with its metal covering removed"); *Williams v. Alford*, 647 F. Supp. 1386, 1392 (M.D. Ala. 1986) (evidence of holes knocked in a wall, destruction of stereo, and dumped trash did "not state a violation of constitutional magnitude").

We need neither approve or reject the above holdings in order to note that the quantum of destruction is not the only factor relevant to whether a search is objectively reasonable. A more salient guidepost for analyzing whether property damage exceeds constitutional bounds concerns the relationship between the damage alleged and the object of the search. The Tenth Circuit's decision in *Lawmaster v. Ward*, 125 F.3d 1341 (10th Cir. 1997), is instructive. There, the court denied defendants summary judgment after finding that the officers' actions—leaving the plaintiff's gun in a dog's water bowl and spreading cigarette and cigar ashes throughout his home and bedding—were not "reasonably necessary to carry out the warrant's purpose to search for and seize a machine gun and parts." *Id.* at 1349-50. In other words, damage that has little connection to the object of the search should raise judicial eyebrows, whereas some damage incident to the seizure of objects within a warrant's scope may be unremarkable. *See id.*

The harm in this case falls into the latter bucket. Recall that the warrants at issue authorized officers to search for and to seize a number of items—including "video gaming machines and other forms of electrical, mechanical, or computer devices"; the "financial proceeds" thereof; "books, records, receipts . . . and other documents" relating to illegal video gaming; relevant "photographs/video"; "business and personal computers . . . and

15

any other electronic media containing evidence of illegal video gaming"; and other "fruits or instrumentalities of the alleged crimes." J.A. 52-53; *see also id.* at 49-63, 2455. It is plain that the damage Cybernet alleges is plausibly connected to the seizure of these items.

For example, as the district court recognized, the destruction that Cybernet attributes to Deputy Deaver—mainly, damage to some of the LED lighting track, portions of the stucco finish underneath it, and a conduit—stems from his efforts to remove the security cameras from Big Aladdin's roof. J.A. 2485-86. Those cameras reasonably came under the search warrant's umbrella as "instrumentalities of the alleged crimes." Indeed, Cybernet does not dispute that the security cameras were within the warrants' scope. Consider also the computer wiring that Cybernet maintains was cut. It, too, has a reasonable relationship to the computers and electronic devices authorized by the warrants to be seized. *See Pac. Marine Ctr., Inc. v. Silva*, 809 F. Supp. 2d 1266, 1283 (E.D. Cal. 2011), *aff'd*, 553 F. App'x 671 (9th Cir. 2014) (holding that damage to computer wiring "was not unnecessarily destructive given the scope of the search, including seizure of 'computer systems'"). Suffice it to say that the damage in this case is a conceptual world apart from the kinds of destruction that other courts have deemed gratuitous—for example, placing a gun in a dog's water bowl, *see Lawmaster*, 125 F.3d at 1341, or shredding furniture and ripping apart boxes of frozen food without any indication that contraband would be found inside, *Davis v. D.C.*, 156 F. Supp. 3d 194, 207 (D.D.C. 2016).

In sum, even taking Cybernet's allegations of damage at face value, the extent of the harm and the fact that the damage occurred incident to the lawful seizure of items in the warrants support the trial court's judgment.

16

B.

Cybernet's allegations of damage suffer also from speculative leaps. "To survive summary judgment, [plaintiffs] must bring forth fact-specific and not merely speculative evidence establishing the cause of [their] injury." *Ross v. F.D.I.C.*, 625 F.3d 808, 817 (4th Cir. 2010) (quotation omitted).

We doubt that Cybernet has observed this injunction. Take, to start, Deputy Deaver's conduct on the roof of Big Aladdin. Cybernet claims that Deaver removed LED lighting from the roof in such a way as to damage "some" of the lighting, the plastic track for the lighting, and the stucco exterior where the track was affixed to the lighting. Appellants' Op. Br. at 37. All of this damage was completely avoidable, it maintains, because the wires for the security cameras and the LED lighting fed into separate conduits on the roof, so there was no reason to remove the LED lights—which were not seized anyway—to retrieve the cameras. J.A. 1856. Similarly, Cybernet also takes issue with Deaver's "yanking or cutting of the wires for the security cameras," on the basis that all he had to do was unplug a 12-inch cord from the base of the cameras to remove them. Appellants' Op. Br. at 37. Because of the force Deaver used, he allegedly damaged the seal of a PVC pipe used as a conduit for wires going through the roof. On Cybernet's telling, the damaged pipe seal led to a water intrusion into the building, which, in turn, caused a smoldering fire that damaged the LED lighting's power supply.

There are a couple of problems with these allegations. For one thing, Deaver maintains that removing the LED lighting was necessary because it was entangled with the security camera wires like "bird nests in a fishing reel." J.A. 1945-46. To be sure, Deaver's

17

conflicting report of the facts does not necessarily undercut Cybernet's rendition, because, at summary judgment, we view the facts in the light most favorable to the non-moving party. Nevertheless, the procedural posture does not excuse Cybernet from providing *some* factual support for its contentions. It comes up far short on this front. As the district court recognized, Cybernet "ha[s] provided no documentary evidence, such as pictures of the cut wires, damaged conduit, water or fire damage, or any receipts from repairs supporting that excessive destruction occurred." J.A. 2486-87; *see Parker v. Fantasia*, No. 16-CV-4265 (KMK) 2019 WL 6498317, at *11-12 (S.D.N.Y. Dec. 3, 2019) (collecting cases where courts have granted summary judgment in favor of defendants on Fourth Amendment claims for excessive damage to property because plaintiffs failed to show demonstrable damage).

Notwithstanding this evidentiary void, Cybernet leaps casually from one inferential step to the next. Consider the alleged water and fire damage. According to Cybernet, a damaged pipe seal led to a water intrusion, which itself caused a fire three days after the searches. But a crucial link is missing: There is no evidence that it rained in the time period between the searches and the alleged fire. J.A. 1220-28 (collecting weather reports). In any event, besides Mr. Smith's own allegations, we have little indication that a fire actually took place. In fact, the fire marshal saw only "minimal" damage, J.A. 1211, and Mr. Smith's contractor said "[t]here weren't really a fire," *id.* at 1575.

What we are left with are a number of actions that may be short of ideal but are not unconstitutional. To repeat, the Fourth Amendment requires officers to use reasonable means, but not the least-intrusive means, to execute a search warrant. So, while there may

18

or may not have been other ways for Deaver to remove the LED lights and pull on the security camera cords, we agree with the district court that his actions were connected to the terms of the warrant and were not sufficiently unreasonable for liability to attach under the Fourth Amendment. J.A. 2485-86. The same goes for a deputy's choice to stand on a wooden table to remove a mounted television and the removal of an adhesive sticker from a window.

Cybernet's various allegations of malice do not, as it suggests, render any damage that occurred here unconstitutional. *See, e.g.*, Appellants' Op. Br. at 11-17, 39 (attributing malice to appellees). The record is rife with speculative accusations of bad blood between the Smiths and county officials—to such an extent that discerning who disliked whom and for what reasons could preoccupy us for months. But plumbing these motivations, whatever they may be, is exactly the sort of inquiry that a Fourth Amendment test of objective reasonableness makes unnecessary. As the Supreme Court has put it, "[t]he Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts like 'malice' and 'sadism' have no proper place in that inquiry." *Graham v. Connor*, 490 U.S. 386, 398 (1989).

All things considered, whatever damage that took place was, as an objective matter, reasonably necessary to execute the search warrants for Cybernet's stores. At bottom, we are cognizant of several realities: (1) the whole business of a search warrant is to authorize officers to seize evidence relevant to an investigation; (2) the relevance of an item may, as here, not be immediately apparent to those gathering the evidence; and (3) the Fourth Amendment clearly restrains, but does not micromanage, how those executing a warrant

19

perform that task.

Our disposition of this case makes it unnecessary to reach the trial court's conclusions as to the roles that each of the individual appellees played in the searches of Cybernet's stores. As noted, the trial court granted appellees summary judgment because Deaver did not cause excessive damage and David and McVicker were only tangentially involved with the searches. Cybernet, for its part, vigorously contests the damage attributable to Deaver and claims that David and McVicker actively directed and encouraged the destruction of its property. But we need not wade into these factual disputes, as the varying degrees of involvement of the individual appellees with a constitutionally permissible search is immaterial for summary judgment purposes. Cybernet's motion to compel further discovery on David's involvement with the searches at issue fails on the same basis.

IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.