**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1394**

KERRIN BARRETT,

        Plaintiff - Appellant,

     v.

PAE GOVERNMENT SERVICES, INC.; AREYAL HALL, Officer, Arlington County Police Department; WILLIAM K. LIETZAU; SEAN HORNER; SHANEDRIA WILBORN; BRIAN GALWAY; JOSHUA LUZIER, Officer,

        Defendants - Appellees.

Appeal from the United States District Court for the Eastern District of Virginia at Alexandria. Anthony John Trenga, District Judge. (1:18-cv-00980-AJT-TCB)

Argued: May 28, 2020                      Decided: September 15, 2020

Before DIAZ and THACKER, Circuit Judges, and TRAXLER, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge Traxler wrote the opinion, in which Judge Diaz and Judge Thacker joined.

**ARGUED:** Peter Charles Cohen, CHARLSON BREDEHOFT COHEN & BROWN, P.C., Reston, Virginia, for Appellant. Ara Loris Tramblian, BANCROFT, MCGAVIN, HORVATH & JUDKINS, P.C., Fairfax, Virginia; Charles McNeill Elmer, JACKSON LEWIS P.C., Reston, Virginia, for Appellees. **ON BRIEF:** Hans H. Chen, CHARLSON BREDEHOFT COHEN & BROWN, P.C., Reston, Virginia, for Appellant. Ryan Samuel, COUNTY ATTORNEY'S OFFICE, Arlington, Virginia, for Appellees Areyal Hall, Brian Galway, and Joshua Luzier. Crystal L. Tyler, Meredith F. Bergeson, JACKSON LEWIS

P.C., Richmond, Virginia, for Appellees PAE Government Services, Inc., William Lietzau, Sean Horner, and Shanedria Wilborn.

‎_____

TRAXLER, Senior Circuit Judge:

Plaintiff Kerrin Barrett brought this action under 42 U.S.C. § 1983 and Virginia state law against Arlington County police officers Areyal Hall ("Hall") and Joshua Luzier ("Luzier"), and Arlington County mental health examiner Brian Galway ("Galway")—collectively the "Arlington County defendants." Plaintiff alleges that the Arlington County defendants unlawfully seized and detained her for a mental health evaluation in violation of the Fourth Amendment and falsely imprisoned her in violation of Virginia state law. Plaintiff also sued her employer, PAE Governmental Services, Inc. ("PAE"), and three of PAE's employees, Sean Horner ("Horner"), Shanedria Wilborn ("Wilborn"), and William Lietzau ("Lietzau")—collectively the "PAE defendants." She alleges that the PAE defendants conspired with the Arlington County defendants to unlawfully seize her and falsely imprison her, also in violation of 42 U.S.C. § 1983 and Virginia state law.

The district court granted the PAE defendants' motion to dismiss the Complaint in its entirety, and granted the Arlington County defendants' motion to dismiss the state law conspiracy claims. The district court later granted summary judgment to the Arlington County defendants on the remaining federal and state law claims.[1] We now affirm.

I.

Plaintiff lived and worked in the Middle East for six years—from 2010 to 2016. From April 2012 to July 2013, she worked as a contractor for PAE in Kabul, Afghanistan,

---

[1] The operative Complaint for purposes of this appeal is the Second Amended Complaint filed on October 31, 2018.

3

on a U.S. State Department contract that was dedicated to improving the rule of law in that country.  In 2014, Plaintiff moved to Dubai in the United Arab Emirates.  Plaintiff claims that she became a victim of constant stalking and harassment by Pakistani, Bangladeshi, and other Southeast Asian men while she was living in Dubai, and that the stalkers followed her when she traveled into Oman and Thailand.

Plaintiff moved back to the United States in early 2016.  In May of that year, she began working for PAE on another U.S. State Department contract.  Plaintiff worked out of PAE's Arlington, Virginia office, and "was responsible for gathering and reporting on prison data, which included women and children incarcerated in the prisons, high value targets, and members of ISIS, the terrorist group in the Middle East."  J.A. at 23.  As explained in more detail below, in July 2017, Plaintiff informed Defendants Horner and Wilborn that she was being stalked and harassed by Southeast Asian men, who were reporting back to the Dubai-based network on their cell phones, and that she had taken steps to identify her stalkers and their location in the United States.  After consulting with PAE's legal staff, Horner contacted the Arlington County Police Department for assistance. Defendants Hall and Luzier responded to the call, and a decision was made to issue an emergency custody order ("ECO") for an involuntary mental health evaluation.  The evaluation was performed by Defendant Galway with the Virginia Department of Health Services, who determined that there was probable cause to believe that Plaintiff was suffering from Post-Traumatic Stress Disorder ("PTSD"), and possibly a delusional disorder, and that she posed a genuine danger to herself and others.  Galway filed a petition

4

for a temporary detention order ("TDO") for further evaluation and treatment of Plaintiff, which was granted by a state magistrate judge.

## II.

For purposes of the appeal from the district court's grant of summary judgment to the Arlington County defendants, we relate the undisputed facts that the PAE defendants and the Plaintiff reported to them during their investigations.

### A. The PAE Defendants

The events that led the PAE defendants to contact the Arlington County police for assistance began in July 2017, when Plaintiff reported the stalking and harassment to Defendants Horner and Wilborn. Plaintiff reported that two incidents had occurred in or near the PAE offices, and they were of particular concern to Horner and Wilborn. First, Plaintiff claimed that a strange "man who fit the pattern of her stalkers came up to her while she was sitting at her desk and said, 'Hello, [long pause] Kerrin' before leaving." J.A. 28 (alteration in original). Second, Plaintiff claimed that she saw a Bangladeshi stalker in the courtyard between the PAE office building and the adjacent Verizon building, and that the man urgently grabbed his cell phone and began talking on it when he saw her. When she returned through the courtyard, Plaintiff approached the security guard in the Verizon building and asked him if he knew anyone who met the description of the man. The security guard told her that there were "a bunch of them up on the 11th floor and that they work for [the] FDIC." J.A. 468.

Plaintiff had previously told her supervisor, Defendant Lietzau, that she believed she was being stalked and harassed by Southeast Asian men. She also informed him about

5

the courtyard incident and asked for his advice. According to Lietzau, Plaintiff also asked him to "go with her to kind of confront these people." J.A. 564. At Lietzau's suggestion, Plaintiff instead reported the stalking incident to Defendant Horner, who was PAE's Security Manager. Horner testified that Plaintiff also told him that she was being stalked and harassed by:

> a coordinated, sophisticated complex[] network of primarily Southeast Asian males, always different men following her, different vehicles following her, having the ability to follow her, track her phone to the extent where they knew what floor in a building she was at, that her e-mails were compromised. She thought her house was bugged. . . . They would do things like knocking on her door in the middle of the night. They would whistle at her dogs to make them bark. They would run into her car . . . and then take off.

J.A. 163. Plaintiff also told Horner that she had discovered that the stalkers were centralized on the 11th floor of the Verizon building. According to Horner, Plaintiff "was convinced that that's where the centralization[,] or hive was the word she used . . . , were located and she was hoping to figure out a name or something like that to be able to figure out who they are, track them down, who they're sending information to." J.A. 137-38. Horner testified that Plaintiff "was hoping that [he] could help her gain access to [the 11th floor of the building] to help identify potentially one of the stalkers." J.A. 136. Horner advised Plaintiff that he could not do so, and that she should not either. According to Horner, Plaintiff told him that she did not own a firearm, but was considering getting one.

Horner asked Plaintiff to document her concerns in a written report. However, in an ensuing series of emails, Plaintiff accused Horner of being derisive and disrespectful, and cut off their communication:

6

To be clear, there is absolutely nothing that can be done about my situation legally. These networks operate just inside the law, here and abroad. My one hope was that I could get assistance identifying who they are reporting back to – or at least the name of one of these "followers," since I now finally determined their location on [Floor] 11 in the adjacent building.

Once again, there is no point in taking any more of your valuable time, nor anyone else's. I will, however, restate that I now am fully aware of the complexity and severity of the war we are fighting, because I live it every day.

J.A. 208. In reply, Horner "strongly recommend[ed]" that Plaintiff not try to "identify the perpetrators or confront[] them." J.A. 211. He also contacted Defendant Wilborn, a PAE Human Resources manager, and asked Wilborn to speak to the Plaintiff. Wilborn documented her conversation with Plaintiff in an Arlington County police report:

[Plaintiff] stated that when she moved back to the [United States from Dubai], a hive of Southeast Asian men followed her here. According to [Plaintiff], these men have been to her home, knocking on her door at odd hours, sitting outside of her home in black cars and following her every move. I asked [Plaintiff] how these men knew where she lived and she responded that her phone was hacked and they are tracking her through her phone. She also mentioned that she has been followed to work, surrounded in the garage and surveilled in the courtyard. She says that there is a nest of them working for FDIC on the 11th floor of the Verizon building. [Plaintiff] says that on more than one occasion, she has seen these men on phones in the courtyard talking to someone in Dubai (the hub) about her. She said that she needs the phone that the men are talking on. I asked her how she planned to get the phone and she said that she just has to walk up to them and take it. She mentioned that her Afghanistan friends advised that the only way to minimize the threat is to kill them. "They are an uncivilized society and they have to be killed." I asked her what she meant by "them." Her response was, "all Pakistani men." "They just have to be killed, like Trump said, we have to turn the key, lock them out and drop a bomb on Pakistan." She also said that she wishes that when she was in Afghanistan, she should have told her Afghanistan friends to kill "them." She also mentioned that one of these men came here to her desk at work and said "hello Kerrin." She also said that she followed one of them up to the 11th floor of the Verizon building, but she couldn't gain access beyond the floor level. She also says that she has a Glock and that she goes to the range to fire it. She takes her phone with her

7

so that the stalkers know that she is there because they are tracking her through her phone.

J.A. 218-19.

Wilborn testified that the majority of PAE's contracts involve State Department support for the Iraq and Afghanistan embassies, and that anywhere from 10 to 15 percent of PAE's employees could fit the description of Plaintiff's alleged stalkers. Wilborn also testified that it would have been difficult for a non-PAE employee to gain access to the PAE offices and find Plaintiff's desk. Given the strong opinions that Plaintiff had voiced about Middle Eastern Asian men, and her view that there was no legal way to solve her problem, Wilborn was concerned for the safety of Plaintiff and the other PAE employees. She worried that Plaintiff might mistakenly identify a PAE employee as a stalker, perceive them as a threat, and harm herself or the "stalker" in "an effort . . . to defend herself in the way that she described" to Wilborn. J.A. 235. After meeting with Plaintiff, Wilborn and Horner met with PAE's legal staff, and a decision was made to have Horner contact the Arlington County Police Department for assistance.

## B. The Arlington County Defendants

Officers Hall and Luzier were assigned to respond to the call for assistance at the PAE offices. The dispatch referenced an "employee who has been becoming increasingly dillusional [sic] and believes is being followed by people in an adjacent building. . . . [The reporting person] advises that employee has mentioned recently about owning a firearm and only way to get rid of people following her is to use the firearm." J.A. 272.

8

The officers met with Horner when they arrived, who reported the substance of the conversations that he and Wilborn had with Plaintiff. Plaintiff, however, was not at work. The officers suggested that Horner contact the Arlington County Department of Human Services ("DHS") directly for their guidance and suggestions, and to call the officers back if they needed further assistance. Horner contacted DHS the same day and spoke with Alexis Mapes, the Emergency Services Supervisor. Mapes documented her conversation with Horner in an email to her staff, which included Defendant Galway:

> [Horner] [r]eports an employee has been increasingly paranoid while at work, citing being followed by Middle Eastern men – who are supposedly following her at work, at home, and whistling at her dog; has described following said men to nearby building to determine who they are and reports that she "found the nest." Employee reported to [Horner] that she did not have a weapon, but made another report to HR that she did have a weapon and the "only way to solve this is to kill them."
>
> . . . . [Horner] plans to consult with HR [and] ask the police to come out to obtain stalking statement from employee when she arrives for the day, with likelihood of employee exhibiting concerning behavior to warrant an ECO/assessment.

J.A. 276. Horner contacted the Arlington County Police Department the following day and requested that Officers Hall and Luzier be dispatched to PAE's offices.

When the officers arrived, they met with Horner again and also spoke directly to Wilborn about her conversation with Plaintiff. The officers then talked to Plaintiff and Wilborn in a conference room. Plaintiff was even-keeled and not disheveled in her appearance. According to Plaintiff, she was initially under the impression that the officers were there to help her investigate and identify her stalkers, but came to realize otherwise when the questioning began. She testified that Officer Luzier was hostile and

9

unprofessional in his behavior, and dismissive of her concerns. Nevertheless, Plaintiff related the substance of the stalking and harassment to the officers, including that she was being followed by different Asian men in black SUVs, and that they "report back on the phones, and it seems to be a network of people doing it." J.A. 489. She told them about the man in the courtyard and that she had spoken to the security guard in the building. She told them that she had taken steps to become a "hard target" by installing a dash cam in her car and a camera in the front of her home, having dogs, and becoming more vigilant and aware. Plaintiff confirmed to the officers that she owned a Glock pistol, but said it was stored in a closet in her home. She denied telling Wilborn that she would go to the range to practice with her Glock, but she admitted that she had taken an NRA self-defense course in May 2017 to obtain a carry permit under Virginia law. She said she used an NRA-provided gun for the class and had not yet obtained the permit. With regard to Wilborn's report of her talking about "killing" the stalkers, she said that this was a misunderstanding; she was only referring to the cultural differences between the Middle East and the United States as to how such situations would be handled. She told the officers that she had no intent to harm her stalkers, but that "[h]opefully if something happens, I'll have the courage to defend myself." J.A. 271.

During the interview, Officer Luzier left the conference room on a couple of occasions. He spoke with Wilborn about her concerns. He contacted the Fairfax County Police Department for information about Plaintiff's reports, but received no response. And he contacted DHS and was told they had no history of mental health encounters with Plaintiff.

10

Under Virginia law, a police officer may take a person into custody without prior judicial approval and transport that person involuntarily for a mental health evaluation pursuant to an ECO if the officer:

> has probable cause to believe that any person (i) has a mental illness and that there exists a substantial likelihood that, as a result of mental illness, the person will, in the near future, (a) cause serious physical harm to himself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any, or (b) suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs, (ii) is in need of hospitalization or treatment, and (iii) is unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

Va. Code Ann. § 37.2-808.A; *see also id.* § 37.2-808.G ("A law-enforcement officer who, based upon his observation or the reliable reports of others, has probable cause to believe that a person meets the criteria for emergency custody . . . may take that person into custody and transport that person to an appropriate location to assess the need for hospitalization or treatment without prior authorization" from a magistrate judge.). After considering all of the information presented to them, the police officers made the decision to issue an ECO, and Plaintiff was transported to the Virginia Hospital Center for a mental health evaluation.

Once an individual is taken into custody by police officers pursuant to an ECO, the individual must be evaluated by "a person designated by the community services board who is skilled in the diagnosis and treatment of mental illness and who has completed a certification program approved" by the Department of Behavioral Health and Developmental Services. Va. Code Ann. § 37.2-808.B. The evaluation must "be conducted immediately. The period of custody shall not exceed eight hours from the time the law-enforcement officer takes the person into custody." *Id.* § 37.2-808.G.

11

Defendant Galway was assigned to perform Plaintiff's evaluation. Galway reviewed the email that he received from Mapes, documenting her conversation with Horner. He spoke with Wilborn, who confirmed the information that she had reported to the police. He also spoke with Lietzau, who told him that he did not think Plaintiff would hurt anyone and that he would not be concerned if Galway decided not to seek an order of commitment. However, Lietzau testified that the statements Plaintiff had made to Horner and Wilborn were "slightly more pointed and harsh sounding, more dangerous sounding, than the verbal statements" that Plaintiff had made to him. J.A. 592. During the call, another work colleague entered Lietzau's office, who agreed that he did not think Plaintiff posed a threat to others. Although there is no evidence that Galway heard the statement of the other coworker, Lietzau testified that he would have given this information to Galway.

Galway also reviewed the medical records and spoke with Dr. Peter Liu, the emergency room physician. Dr. Liu consulted with a psychiatrist, Dr. Peggy Lomax, and concluded that Plaintiff was suffering from a chronic paranoia disorder, with an acute episode. Dr. Liu concluded that "further investigation is necessary to either rule in delusional paranoia [disorder] [versus] actual[ly] being stalked by multiple middle eastern men." J.A. 386. Dr. Liu also advised Galway that he "felt, given that she was refusing treatment . . . and based on what she had been saying, that he was concerned that she might put herself or others at risk." J.A. 351.

When Galway interviewed Plaintiff, she reiterated her claims that she was being stalked and harassed by the Southeast Asian men. She denied that she was undergoing mental health treatment, and repeatedly refused to voluntarily admit herself for an

12

evaluation. She told Galway that she did own a gun, but that it was locked away. She also told Galway that she was willing to surrender it. She agreed to seek outpatient care, but no provider or timeframe was discussed. Galway testified that he did not get the impression that Plaintiff would follow through. Plaintiff testified that it was her impression that she and Galway were "horse trading" or "bargaining" over the gun and outpatient care, and she "was hopeful that if [she] answered correctly, then [she] would be let go." J.A. 503.

After completing his evaluation, Galway's assessment was that Plaintiff was suffering from PTSD and possibly from a delusional disorder. Galway returned to the DHS office to discuss the case with Mapes. They discussed whether a less restrictive setting would be appropriate under the circumstances, and whether Plaintiff was likely to seek treatment voluntarily. They also discussed the conflicting information about Plaintiff's possession of a gun and her prior use of the gun, as well as Plaintiff's reported statements to Wilborn about killing others. They then took the case to a DHS team meeting with their colleagues. The consensus decision was that the risk that Plaintiff might harm herself or others was too high, and that she needed inpatient evaluation and treatment.

Mapes documented the meeting, and the basis for the decision, in her affidavit. She concurred that Plaintiff appeared to suffer from PTSD and paranoia. She determined that:

> there was a substantial likelihood that, due to her mental illness, she would cause harm to one of the "stalkers" or to herself by confronting one of the "stalkers" in the near future, given: a) Plaintiff's conflicting statements about whether she had a gun; b) a stated need for the stalkers to be killed; and c) Plaintiff's report that she had recently followed a "stalker" into a nearby building and claimed a "stalker" had come to her desk at work.

13

J.A. 414. This "raised a substantial concern that Plaintiff would mistake an innocent person for a 'stalker' and either commit an act of violence or take some action to cause one of the men to defend themselves and harm her." J.A. 414. Also,

> Plaintiff did not appear to understand how her perceptions and paranoia were impacting her life, safety, and livelihood. She followed a stranger, repeatedly called the Fairfax police, and jeopardized her employment through her actions. Plaintiff needed mental health treatment for these issues, refused to seek such treatment, and told Mr. Galway she had never sought mental health treatment. Because she told Mr. Galway she had never sought mental health treatment, we had no way of contacting her mental health provider to obtain collateral information about [her].

J.A. 415. Accordingly, Mapes "concluded Plaintiff clearly met the criteria to seek a [TDO] from the magistrate and so advised Mr. Galway." J.A. 414.

Under Virginia law, the magistrate judge, upon sworn petition by a mental health examiner, will issue a TDO "if it appears from all evidence readily available, including any recommendation from a physician, clinical psychologist, or clinical social worker treating the person, that the person" satisfies the same criteria required for the issuance of an ECO. Va. Code Ann. § 37.2-809.B. "The magistrate shall also consider, if available, (a) information provided by the person who initiated emergency custody and (b) the recommendations of any treating or examining physician licensed in Virginia either verbally or in writing prior to rendering a decision." *Id.* In this case, the magistrate judge agreed that there was probable cause to issue a TDO, and Plaintiff was detained for further evaluation and a commitment hearing. In accordance with the Virginia statutes, an independent medical examiner was assigned to evaluate the Plaintiff. The examiner

14

concluded that Plaintiff did not meet the criteria for involuntary commitment, and the case against Plaintiff was dismissed. *See* Va. Code Ann. §§ 37.2-813 through -817.[2]

C.

Plaintiff filed a complaint under 42 U.S.C. § 1983 against the Arlington County defendants for unlawful seizure under the Fourth Amendment. Plaintiff also brought § 1983 claims against the individual PAE employees, alleging that they conspired with the Arlington County defendants to violate her rights. Plaintiff also alleged that the Arlington County defendants falsely imprisoned her, and that the Arlington County defendants and the PAE defendants conspired to falsely imprison her and violate her civil rights, all in violation of Virginia state law.

In its first order, the district court granted the PAE defendants' motion to dismiss the § 1983 counts against the individual PAE defendants and the state law conspiracy counts against all of the PAE defendants. The district court also granted the Arlington County defendants' motion to dismiss the state law conspiracy counts. In its second order, the district court granted summary judgment to the Arlington County defendants on the remaining federal and state law claims. We affirm both decisions.[3]

---

[2] Although it is not entirely clear whether the independent examiner or the magistrate judge were made aware of it, Plaintiff had been seeing a psychologist who had diagnosed her with PTSD—contrary to her denials of any such treatment to the Arlington County defendants.

[3] Plaintiff does not appeal the district court's dismissal of the § 1983 claims against Defendant Lietzau, the false imprisonment claim against Defendant Galway, or the claims that Lietzau and PAE conspired with Galway to violate her constitutional rights and falsely imprison her. To the extent Plaintiff's § 1983 claims alleged procedural due process claims (Continued)

15

We begin with the district court's decision to grant summary judgment to the Arlington County defendants on Plaintiff's § 1983 claims, and to Officers Hall and Luzier on the false imprisonment claims. We review the decision to grant summary judgment de novo. *See Cybernet, LLC v. David*, 954 F.3d 162, 167 (4th Cir. 2020). "A grant of summary judgment is proper when no genuine dispute of material fact exists for trial. In making this determination, we view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Id.* at 168 (internal citations omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## A. Federal Claims Under § 1983

Qualified immunity bars § 1983 actions against government officials in their individual capacities "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted); *see also Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015). "Qualified immunity balances two

---

under the Fifth Amendment, Plaintiff has also abandoned these claims. In supplemental briefing, Plaintiff agreed that the district court properly confined its analysis of her claims strictly to the Fourth Amendment, and that the district court's orders finally disposed of all aspects of her claims against all defendants.

important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Simms*, 571 U.S 3, 5 (2013) (per curiam) (internal quotation marks omitted). Accordingly, even if a court finds or assumes that a government official violated an individual's constitutional rights, the official is entitled to immunity so long as the official did not violate clearly established law.[4] "Clearly established means that, at the time of the [official's] conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. In other words, existing law must have placed the constitutionality of the [official's] conduct beyond debate." *Wesby*, 138 S. Ct. at 589 (internal quotation marks and citations omitted).

The Fourth Amendment protects the people "against unreasonable searches and seizures." U.S. Const. amend. IV. Determining whether a person's Fourth Amendment rights have been violated in the mental health context requires us to determine whether the officials had probable cause to seize the person for an emergency mental evaluation. *See Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003). Such probable cause exists "when

---

[4] *See Pearson v. Callahan*, 555 U.S. 112, 236 (2009) ("The judges of the district courts and the courts of appeals [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

the facts and circumstances within the defendant's knowledge and of which the defendant had reasonably trustworthy information were sufficient to warrant a prudent man to believe that the person poses a danger to himself or others." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 172 (4th Cir. 2016) (internal quotation marks omitted).

"Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *Wesby*, 138 S. Ct. at 586 (internal citations and quotation marks omitted). It "is a practical, nontechnical conception that addresses the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Bailey*, 349 F.3d at 739 (internal quotation marks omitted). This is particularly true in the mental health context where police officers and mental health professionals are called upon to make "a number of difficult judgment calls" in their efforts to protect both the individual and the public from potential dangers, *Goines*, 822 F.3d at 170, and there is a "distinct lack of clarity in the law governing seizures for psychological evaluations," *Raub*, 785 F.3d at 882 (internal quotation marks omitted).

The question before us then is to determine whether, based upon the information that was presented to them, Defendants Hall, Luzier, and Galway had probable cause as a matter of law to detain Plaintiff for an emergency mental health evaluation or, if they did not, whether established law was "sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted). The district court held that the officers and Galway were entitled to qualified immunity from suit, and we agree.

18

The crux of Plaintiff's argument on appeal, as it was below, centers on her testimony that she has been the victim of ongoing harassment and stalking by Southeast Asian men, both overseas and in the United States. But instead of helping her investigate the stalking, the Arlington County defendants disbelieved and dismissed her claims and took her into custody for an emergency psychological evaluation without probable cause. In support, Plaintiff relies upon the fact that she told the officers that she had no intention of harming anyone; that she did not make some of the statements that Horner and Wilborn reported to the Arlington County defendants; and that others were misunderstood or taken out of context. For example, Plaintiff denies using the terms "hive" or "nest" to describe the location of the stalkers on the 11th floor of the Verizon building; denies that she used the term "hub" to describe the location of the Dubai-based network of stalkers; denies that she told Horner that she did not own a gun; admits that she told Wilborn that she owned a gun, but denies that she told her that she practiced at the range with it; and denies that she told Wilborn that she had to take a stalker's phone to find out who is behind the stalking. She does not deny her comments about "killing" Middle Eastern persons, but contends that these comments were taken out of context or misunderstood by Wilborn. According to Plaintiff, she was only referring to the cultural differences between the Middle East and the United States in how such matters would be handled.

As the district court properly concluded, however, Plaintiff's asserted disputes of fact "relate to what Plaintiff said or did *before* her behavior was reported" to the Arlington County defendants, and "whether Plaintiff's statements [to Horner and Wilborn] were taken out of context." J.A. 774. These are not material factual disputes because we must

19

evaluate the officials' conduct in light of the totality of the facts and circumstances that were presented to them at the time. As the district court explained, "there is no genuine factual dispute as to what information Defendants Hall, Luzier, and Galway had before making the decision to issue the ECO and petition for the TDO, including what Horner, Wilborn, or Plaintiff said" to them. J.A. 774. Thus, the question of whether probable cause existed is based upon the totality of the facts and circumstances presented to the Arlington County defendants, including the reports of all of the persons involved when they made the difficult judgment call to detain Plaintiff for the emergency mental health evaluation.[5]

### 1. Defendants Hall and Luzier

We hold that the facts and circumstances within the police officers' "knowledge and of which [they] had reasonably trustworthy information were sufficient to warrant a prudent man to believe" that Plaintiff posed a danger to herself and others. *Goines*, 822 F.3d at 172.

First, it is undisputed that Plaintiff was calm and not disheveled in her appearance, and that she denied any intent to harm her stalkers. But from the point of view of the officers, Plaintiff's account to them was largely *consistent* with the most troubling

---

[5] Plaintiff argues that the district court should not have relied upon Wilborn's written police statement because there is no evidence that the written statement was provided to the police before they issued the ECO. However, even if it is true that Wilborn *wrote* her statement after the ECO was issued, Defendants Horner and Wilborn testified that the information contained therein (including Wilborn's conversation with Plaintiff) was provided to the police officers when they arrived at the PAE offices. Accordingly, we hold that the district court properly relied upon the written statement, and that we may do so as well.

information that Horner and Wilborn had reported to them. Plaintiff told the officers that, while she might be paranoid, she believed that she was being stalked and harassed by Southeast Asian men under the direction of the Dubai-based network. She told the officers that she had taken steps to become a "hard target" for her stalkers, that she had approached the security guard in the adjoining building in an effort to identify the stalker in the courtyard and that, in doing so, she had determined where her Dubai-based stalkers were centralized. Plaintiff told the officers that, despite at least four prior calls to the Fairfax Police Department, nothing had been done to stop the harassment. Plaintiff also admitted that she told the officers that she owned a firearm, that she had recently taken a firearms course to obtain her concealed weapons permit, and that she hoped she would have the courage to defend herself if necessary.

According to the reports of Lietzau and Horner, Plaintiff had sought their assistance to gain access to the adjoining building in order to identify and confront her stalkers. And, when Plaintiff suspected that Horner disbelieved her claims, she told him that she was "fully aware of the complexity and severity of the war we are fighting because I live it every day." J.A. 208. Wilborn's account of Plaintiff's statements to her were even more troubling. Plaintiff told Wilborn that she owned a Glock pistol, went to the range to practice with it, and took her cell phone (which was being tracked) with her so that her stalkers would know she was there. Plaintiff also told her that there was no legal means to deal with her stalkers and, although she made no direct threat to kill her stalkers, she made several references to killing such "uncivilized" Middle Eastern men, and she told Wilborn that she hoped she would be able to defend herself if necessary.

21

There is no evidence that the officers had reason to question the veracity of the information that the PAE defendants reported to them. The reporting persons were management officials—a PAE security manager and human resources manager. Nor did the officers make a snap decision to detain Plaintiff without meaningful inquiry. The officers met with the PAE employees prior to and during their interview of Plaintiff to discuss the concerns that led them to call the police. Specifically, the PAE defendants explained their concerns that Plaintiff might mistake one of their Middle Eastern employees as a stalker—particularly in light of the fact that she believed that one of her stalkers had successfully breached PAE's offices and that another was watching her just outside the PAE offices.

In the end, therefore, the statements of the PAE defendants and Plaintiff were remarkably consistent. A decision had to be made, and the officers made the reasonable, albeit difficult, judgment call that Plaintiff posed a danger to herself and others and should be transported to the hospital for a mental health evaluation. Officers Hall and Luzier were not required to "walk[] away from the situation" merely because Plaintiff denied making some of the statements that her coworkers had reported to the officers, and denied that she had any intent to harm herself or her stalkers. *Gooden v. Howard Cnty.*, 954 F.2d 960, 967 (4th Cir. 1992) (en banc). Indeed, "had 'the officers done nothing'"—and had Plaintiff hurt herself or one of her perceived stalkers in a misguided attempt to defend herself—"the consequences may have been irremediable." *Cloaninger v. McDevitt,* 555 F.3d 324, 333 (4th Cir. 2009) (quoting *Gooden*, 954 F.3d at 967). As we have recognized in similar cases, it would be "a misguided application of § 1983 to expose to liability those who by all

22

objective indicia were only trying to help." *Gooden*, 954 F.3d at 967. Officers should not "be faulted for taking action against what they reasonably perceived to be a genuine danger to" the Plaintiff and others at the time. *Id.* at 966.

## 2. Defendant Galway

For similar reasons, we hold that Defendant Galway had probable cause to seek a TDO from the magistrate judge. Plaintiff argues that Galway lacked probable cause for two additional reasons: Lietzau told Galway that he did not believe Plaintiff would hurt anyone, and Plaintiff told Galway that she would surrender her gun and seek outpatient treatment. But, again, we must evaluate whether Galway had probable cause to detain Plaintiff based upon the *totality* of the facts and circumstances known to him when he made his decision, and not based upon a culling of the more favorable reports that he received.

Galway reviewed the reports and concerns of Horner and Wilborn, as well as the medical reports. Galway believed, based upon his training and assessment, that Plaintiff suffered from PTSD and possibly a delusional disorder, and he questioned whether she would follow through with outpatient treatment. Dr. Liu's view was consistent with Galway's evaluation, and he advised Galway that he also believed that Plaintiff posed a danger to herself and others. Like the officers, Galway had no reason to question the veracity of the reports that he received from the other PAE employees, or Dr. Liu's opinion, and there is nothing to suggest that he failed to perform a sufficient inquiry before making his judgment call. On the contrary, his actions reflected great care and recognition of the gravity of the decision that he was making. He consulted with his supervisor and the DHS

23

team regarding the proper course of action before making the judgment call to apply for the TDO.

For these reasons, we hold that the totality of the facts and circumstances were sufficient to warrant a prudent man in Galway's position to believe that the Plaintiff posed a danger to herself and others, and that an emergency mental health detention for further evaluation and treatment was prudent.

3.

Because the undisputed evidence establishes that the Arlington County defendants had probable cause to detain Plaintiff, qualified immunity bars her § 1983 claim under the first prong of the qualified immunity test, and summary judgment was properly awarded. But even if we were to assume that probable cause to detain Plaintiff was lacking, the Arlington County defendants are also entitled to qualified immunity under the second prong because "the unlawfulness of their conduct was [not] clearly established at the time" the decision was made. *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted).

Relying principally on our decision in *Bailey v. Kennedy*, Plaintiff argues that it was clearly established that the Arlington County defendants lacked probable cause to believe that she posed a danger to herself or others. But, unlike in *Bailey*, the officials here did not rely on a single piece of evidence or take Plaintiff into custody without any independent basis for concluding that Plaintiff posed a genuine danger of harming herself and others. *See Bailey*, 349 F.3d at 740 (holding that a single 911 report was an insufficient based to seize the Plaintiff for a psychological evaluation). As explained above, the Arlington County defendants relied upon numerous statements from Plaintiff's coworkers about her

24

frustrations with her stalkers and the actions she had taken to address them, as well as upon Plaintiff's own statements about her inability to resolve the situation, her ownership of a weapon, and her recent attendance at a firearms class.[6]

Accordingly, we reject Plaintiff's argument that the law at the time of the officials' conduct "was sufficiently clear that every reasonable official would understand that what he is doing is unlawful," placing the unconstitutionality of the officials' conduct "beyond debate." *Wesby*, 138 S. Ct. at 589 (internal quotation marks omitted). On the contrary, "[r]easonable [officials], relying upon our decision[s] . . . would have concluded that involuntarily detaining [Plaintiff] was not only reasonable, but prudent." *S.P. v. City of Takoma Park*, 134 F.3d 260, 267 (4th Cir. 1998).[7]

## B. The State Law Claims

We also affirm the district court's grant of summary judgment to Officers Hall and Luzier on Plaintiff's state law claims for false imprisonment. Under Virginia law, "[f]alse imprisonment is the restraint of one's liberty without any sufficient legal excuse. If the

---

[6] Plaintiff's reliance on our decision in *Goines v. Valley Community Services Board* is also misplaced. *See* 822 F.3d 159 (4th Cir. 2016). In *Goines*, we reversed a district court's decision granting a motion to dismiss the complaint because the complaint allegations were sufficient to demonstrate a lack of probable cause. As the district court correctly noted, we have a "fully developed factual record" in this case, "which demonstrates that the Officers acted on far more evidence and a lengthier investigation than did the officers in *Goines*." J.A. 782, n.2.

[7] Because we conclude that the Arlington County defendants had probable cause to detain Plaintiff for a mental health evaluation, and did not violate clearly established law in doing so, we need not address the defendants' alternative argument that the Virginia magistrate's ruling was an intervening act that insulated the defendants from liability.

25

plaintiff's arrest was lawful, the plaintiff cannot prevail on a claim of false imprisonment." *Lewis v. Kei*, 708 S.E.2d 884, 890 (Va. 2011) (internal citation omitted). The district court granted summary judgment to the officers because, to state a claim for false imprisonment, the "plaintiff must allege that the process leading to the arrest was unlawful," and "the facially valid ECO that Defendant Hall issued upon conclusion of the interview with Plaintiff was a form of legal process." J.A. 786 (internal quotation marks omitted).

Because Plaintiff did not challenge this basis for the district court's grant of summary judgment on the false imprisonment claims in her opening brief, she has waived her appeal from it. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." (internal quotation marks and alterations omitted)); *Brown v. Nucor Corp.*, 785 F.3d 895, 918 (4th Cir. 2015) ("Failure of a party in its opening brief to challenge an alternate ground for a district court's ruling waives that challenge.") (alterations omitted)); *Cavallo v. Star Enter.*, 100 F.3d 1150, 1152 n.2 (4th Cir. 1996) ("[A]n issue first argued in a reply brief is not properly before a court of appeals.").

Moreover, even if Plaintiff had challenged the district court's ruling on this point, Plaintiff "failed as a matter of law to proffer evidence sufficient under Virginia law for a jury to find that Defendants Luzier or Hall falsely imprisoned her." J.A. 787. As explained above, Officers Hall and Luzier spoke with the witnesses at length, interviewed Plaintiff about her concerns, and had probable cause to believe that Plaintiff posed a threat to herself and others. They lawfully detained her for an emergency mental health examination

26

pursuant to Virginia's mental health statute. This decision was, in turn, validated by the mental health examiner, in consultation with his supervisor, and by the issuance of the TDO by the state magistrate judge. Accordingly, we hold that the officers had the requisite legal justification to detain Plaintiff for the evaluation, and they followed the legal process provided by Virginia law in doing so. Therefore, they are entitled to summary judgment on the false imprisonment claims.

IV.

We now turn to the Plaintiff's claim that the district court erred in dismissing her § 1983 claims for unlawful seizure against Defendants Horner and Wilborn, and her state law conspiracy claims against PAE and the individual PAE defendants.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotation marks, alterations, and citations omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[W]here a conspiracy is alleged, the plaintiff must plead facts amounting to more than 'parallel conduct and a bare assertion of conspiracy. Without more, parallel

27

conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.'" *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556-57). "The factual allegations must plausibly suggest agreement, rather than being merely consistent with agreement." *Id.*

## A. The Federal Claims Under § 1983

Ordinarily, private actors are not liable under 42 U.S.C. § 1983, because the statute only provides relief for deprivations of constitutional rights by state actors. Nevertheless, "private persons who willfully participate in joint action with a state official act under color of law within the meaning of § 1983." *Scott v. Greenville Cnty*, 716 F.2d 1409, 1422 (4th Cir. 1983) (internal quotation marks omitted). To establish a conspiracy under § 1983, the plaintiff must show that the Defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). This is a "weighty burden." *Id.*

Plaintiff's complaint alleges that her seizure resulted from two separate conspiracies. The first is that the PAE defendants "agreed on a plan to use [Plaintiff's] reports of being stalked at the office to discredit her [by] falsely claiming that she was a threat and danger to others that required her immediate removal from the office and transportation to a hospital for examination." J.A. 32. Their motive for doing so, Plaintiff alleges, was to discredit her recent claims that PAE was fraudulently overstating its performance on the State Department contract that she was working on, and had failed to

28

provide sufficient security against her alleged stalkers. However, Plaintiff does not allege that Officers Hall and Luzier were a part of this alleged conspiracy; indeed, she affirmatively acknowledges that they were not. Rather, Plaintiff's § 1983 conspiracy claims rest upon her conclusory allegations that Officers Luzier and Hall entered into a separate agreement with the PAE defendants to remove Plaintiff from the workplace—regardless of her answers to their questions and regardless of whether they had probable cause to do so.

Plaintiff, however, sets forth no factual allegations that might explain why the police officers would enter into such an agreement with the PAE defendants to intentionally violate Plaintiff's constitutional rights. There is no allegation that the police officers even knew the PAE defendants, much less that they had any preexisting relationship with them. There is no allegation that the police officers knew about the PAE defendants' separate conspiracy, nor any explanation as to why the police officers would agree to help them cover up their alleged illegal activities and security failures. In sum, there are no factual allegations that plausibly suggest that the officers agreed to go along with the PAE defendants' illegal plan to violate Plaintiff's rights. Even if an allegation of a specific motive might not be required to state a claim for conspiracy, the Plaintiff was still required to allege *some* facts that would plausibly suggest that the police officers entered into an agreement with the PAE defendants to accomplish the same conspiratorial objective. She has not. "Although in form a few stray statements [in her complaint] speak directly of agreement, on fair reading these are merely legal conclusions resting on the prior allegations." *Twombly* , 550 U.S. at 564 (footnote omitted).

29

While Plaintiff claims that it was sufficient to allege that the officers met with Horner and Wilborn prior to and during their interview of Plaintiff, this argument fails to save her conspiracy claim. As explained above, the "factual allegations must plausibly suggest *agreement*, rather than being merely *consistent* with agreement." *Society Without a Name*, 655 F.3d at 346 (emphasis added). The mere fact that the officers met with the reporting persons when they were dispatched to the PAE offices does not plausibly suggest that they shared a common plan or "conspiratorial objective" to violate Plaintiff's civil rights. *Hinkle*, 81 F.3d at 421. On the contrary, the meetings were consistent with the normal interaction between the police and citizenry when a complaint is investigated. Because Plaintiff's allegations that Officers Hall and Luzier conspired with Horner and Wilborn to illegally seize Plaintiff and remove her from the workplace for a psychological evaluation is comprised of nothing more than conclusory assertions and rank speculation, we affirm the district court's dismissal of the claims under Rule 12(b)(6).

## B. The State Law Claims

Plaintiff's claims that the PAE defendants and the Arlington County police officers conspired to violate her civil rights and to falsely imprison her, in violation of Virginia state law, fail for the same reasons. Under Virginia law, "[a] civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not itself criminal or unlawful, by criminal or unlawful means." *Hechler Chevrolet, Inc. v. General Motors Corp.* 337 S.E.2d 744, 748 (Va. 1985).

30

Plaintiff's state law conspiracy claims rest upon the same conclusory and speculative allegation that the PAE employees and the police officers conspired to violate her civil rights and to falsely imprison her, regardless of how she acted or what she said to the police. As explained above, Plaintiff does not allege that the Arlington County defendants were a part of the alleged conspiracy to have Plaintiff involuntarily committed because of her whistleblowing activities or PAE's security failures, and the conclusory allegations in the Complaint are insufficient to support a plausible inference that the Arlington County police officers conspired with the PAE defendants to unlawfully seize and detain her without probable cause, in violation of the Fourth Amendment, or to falsely imprison her under state law.

V.

For the foregoing reasons, we affirm the district court's order dismissing all of the claims against the PAE defendants, as well as the state law conspiracy claims against the Arlington County defendants. We also affirm the district court's order granting summary judgment to the Arlington County defendants.[8]

AFFIRMED

---

[8] In light of our conclusions, we need not address Plaintiff's appeal of the district court's dismissal of her claim for punitive damages.