**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-1360**

---

DILLARD A. PUTMAN,

> Plaintiff − Appellee,

> v.

CORPORAL QUENTIN HARRIS,

> Defendant – Appellant,

> and

SERGEANT TRAVIS HAYTON,

> Defendant.

---

Appeal from the United States District Court for the Western District of Virginia, at Abingdon.  James P. Jones, Senior District Judge.  (1:20−cv−00063−JPJ−PMS)

---

Argued:  January 24, 2023                    Decided:  April 19, 2023

---

Before WILKINSON and DIAZ, Circuit Judges, and Max O. COGBURN, Jr., United States District Judge for the Western District of North Carolina, sitting by designation.

---

Reversed and remanded by published opinion.  Judge Diaz wrote the opinion, in which Judge Wilkinson and Judge Cogburn joined.

---

**ARGUED:**  Julian Friedman Harf, GUYNN WADDELL CARROLL & LOCKABY, P.C., Salem, Virginia, for Appellant.  Andrew Lucchetti, HALPERIN LAW CENTER, LLC,

Glen Allen, Virginia, for Appellee.  **ON BRIEF:**  Darrell J. Getman, HALPERIN LAW CENTER, LLC, Glen Allen, Virginia, for Appellee.

———————

DIAZ, Circuit Judge:

Virginia police responded to a 911 call seeking help to locate Dillard Putman, who they were told was potentially armed and suicidal. After failing to find Putman in his house, two officers and a K-9 searched the surrounding woods. The dog quickly caught Putman's scent, leading officers to find him lying in a shallow ditch.

Bodycam footage shows the subsequent heated encounter, with officers demanding Putman turn around and Putman angrily ordering them to leave. After a two-minute impasse, an officer twice released the dog, who bit Putman and caused a severe injury. The officers ultimately discovered Putman didn't have a gun. Putman sued under state law and 42 U.S.C. § 1983, alleging, among other things, violations of his Fourth Amendment rights.

The district court denied the K-9 officer's summary-judgment motion asserting qualified immunity, holding that the undisputed facts didn't establish whether the officer had a reasonable belief that Putman was armed. We disagree and reverse.

I.

A.

In May 2019, Dillard Putman sent several texts to his wife, Kandi, threatening self-harm and suicide. One message read that Putman had "a gun in [his] mouth," and warned Kandi to not "come to the house[.] I'd rather some one else find me." J.A. 48–50. She went anyway, but Putman wasn't home. Kandi called 911 and told the operator about Putman's disturbing texts.

3

Officers arrived soon after. Kandi met them in the driveway and showed them Putman's messages. She also mentioned that Putman regularly drank alcohol and that he owned several firearms, though she couldn't say if Putman had a gun with him. She consented to a search of the property.

Officers didn't find Putman in the house, though they did find a rifle. Because the property was surrounded by woods, the officers used a K-9 unit, led by Corporal Quentin Harris, to search it. Sergeant Travis Hayton, armed with a rifle and taser, accompanied Harris. Both were told that Putman had threatened suicide and claimed to have put a gun in his mouth.

The dog quickly caught Putman's scent.[1] The officers found Putman laying in a shallow ditch next to an uprooted tree. They didn't see any weapons in Putman's hands or near him. But they did smell alcohol and reportedly saw empty beer cans around Putman, though no cans are visible on the bodycam footage.

The encounter escalated quickly, with Hayton pointing his rifle at Putman while ordering him to stand and get his hands up. Harris stood to the side, tightly gripping his dog's leash as it barked repeatedly.

Putman initially refused Hayton's commands, arguing, "Hands up for what? This is my property! I'm not getting up. I live here." Bodycam Footage at 4:16. The officers continued to order Putman to get up, with Harris asking, "Do you want to get dog bit?" *Id.*

---

[1] The search and its aftermath were recorded on Hayton's body camera.

at 4:23. Putman soon rose but refused the officers' orders that he "face away." *Id.* at 4:33. He instead demanded that the officers leave.

The argument went on for about two minutes. Hayton lowered his rifle, instead pointing his taser at Putman. Harris warned Putman that the dog would bite him if he didn't comply. Putman replied that if that happened, he would "fucking sue." *Id.* at 4:45. He demanded to see a warrant. Harris informed Putman they didn't need one. Putman replied, "The fuck you don't," and reiterated his intention to sue if the dog bit him. *Id.* at 5:00.

Hayton repeated his order that Putman turn around, to which Putman challenged, "For what? What have I done wrong?" *Id.* at 5:13. Hayton asked, "Did you say you're gonna kill yourself?" *Id.* at 5:20. Putman responded, "No," to which Hayton replied, "Yeah you did." *Id.* Putman countered, "Where's the gun? Show me the fucking gun," while lifting his shirt to show he had nothing in his waistband, although the officers couldn't see his back. *Id.* at 5:24. Hayton moved closer and told Putman to turn around, but he refused and repeated his demand to see a warrant.

The officers explained they didn't need a warrant since Kandi gave them permission to be on the property. Putman replied that it was his property, telling the officers to "get the fuck off of it." *Id.* at 5:45.

The officers again ordered Putman to turn around and put his hands behind his back. He answered, "I'm not," again lifting his shirt, but only showing the front and sides of his body. *Id.* at 5:51.

5

Harris then warned, "You gonna get dog bit." *Id.* at 5:58. Putman threw his hands out, exclaiming, "For what? For what?" *Id.* at 6:05. At this moment, Harris released the dog. It lunged at Putman's arm but missed, instead latching onto his shirt.

Putman fell to the ground and Hayton jumped on top of him. Harris pulled the dog away and stood to the side. Hayton tried to cuff Putman, but Putman resisted. Hayton then tased Putman, causing him to fall back on the ground. At the same moment, Harris again released the dog, which bit into Putman's upper arm. Putman screamed, "You got me!" *Id.* at 6:22. Hayton cuffed Putman while the dog remained latched. Once Putman was secured, Harris commanded the dog to release. The bite lasted for around 30 seconds.

The officers then led Putman back to the house. They searched him and found a pocketknife and a small flashlight, but no firearm.

Emergency medical services transported Putman to a local hospital, but he had to be airlifted to a larger facility for emergency surgery. The dog bite caused severe damage to Putman's brachial artery, requiring the surgeon to harvest a vein from Putman's leg to repair it.

## B.

Putman sued, asserting various § 1983 and state-law claims against Hayton and Harris. As relevant here, Putman accused Harris of excessive force in ordering the dog bite, in violation of the Fourth Amendment.

All parties moved for summary judgment. The officers asserted qualified immunity on the federal claims and that Virginia's good-faith immunity barred the state-law claims. The district court granted the officers summary judgment on all except Putman's claim that

Harris used excessive force in ordering the dog bite and the attendant state-law claims. Only the federal denial is before us.[2]

The district court held that a jury could conclude that Harris's use of the dog was excessive. *Putman v. Harris*, No. 1:20CV00063, 2022 WL 908937, at *7 (W.D. Va. Mar. 28, 2022). The court found a dispute "as to whether Harris had a reasonable belief that Putman may have been armed." *Id.* at *9.

The court explained that the bodycam video "is not conclusive as to whether Harris reasonably could have believed that Putman may have possessed a gun." *Id.* at *7. While the officers claimed they "believed that [Putman] could be armed, based on information from his spouse," they never saw a firearm during the encounter. *Id.* at *6. The court determined that Putman's actions didn't "escalat[e] the situation into an immediate threat." *Id.* at *7. Thus, "a well-instructed jury" should determine whether Harris's use of force was justified. *Id.*

The court also held the right at issue was clearly established, so Harris was on notice that "the use of serious or violent force in arresting or otherwise seizing an individual who is not actively resisting and does not pose an immediate threat amounts to a constitutional violation." *Id.* at *8.

---

[2] In denying Harris summary judgment for the excessive force count, the district court resultingly denied him summary judgment on the accompanying state law counts of assault and battery. *Putman v. Harris*, No. 1:20CV00063, 2022 WL 908937, at *9 (W.D. Va. Mar. 28, 2022) ("Virginia state-law assault and battery claims are analyzed under Fourth Amendment principles."). But if Harris's "actions were constitutional . . . then these state law claims would also be dismissed." *Id*. (cleaned up). As a result, the parties focus solely on the federal count, and we do the same.

Harris appealed.

## II.

The Fourth Amendment "guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures.'" *Graham v. Connor*, 490 U.S. 386, 394 (1989) (quoting U.S. Const. amend. IV). Although Putman wasn't a criminal suspect, officers may seize a person for an "emergency mental health evaluation," so long as they have probable cause. *Barrett v. Pae Gov't Servs., Inc.*, 975 F.3d 416, 429 (4th Cir. 2020). Such probable cause exists when officers know reliable facts "sufficient to warrant a prudent man to believe that the person poses a danger to himself or others." *Id.*

The district court found the officers met this standard, given Putman's texts and his "strange[]" behavior. *See Putman*, 2022 WL 908937, at *5–6. We agree, and in any event, Putman doesn't argue otherwise.

Still, officers can't use excessive force to carry out a seizure. To determine whether the force used was excessive, we apply a "standard of objective reasonableness." *Clem v. Corbeau*, 284 F.3d 543, 550 (4th Cir. 2002). This is a question of law, which we judge "from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396.

Harris asserts qualified immunity, which "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (cleaned up). He is thus immune from suit if his "conduct [was] objectively reasonable under the circumstances." *Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015). And since we "prefer questions of qualified immunity to be decided at the earliest possible stage

8

in litigation[,] . . . once a state actor's conduct is established beyond dispute, the question of whether that conduct was reasonable is one of law for the court to decide." *Id.* (cleaned up).

Our analysis asks two questions: "whether the facts make out a violation of a constitutional right and whether the right at issue was clearly established at the time of defendant's alleged misconduct." *West v. Murphy*, 771 F.3d 209, 213 (4th Cir. 2014) (cleaned up). If the answer to either is no, immunity attaches. We may address the questions in "the order of decisionmaking that will best facilitate the fair and efficient disposition of each case." *Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

That said, our review of a denial of qualified immunity at the summary-judgment stage is limited. We consider de novo whether "there was no violation of clearly established law accepting the facts as the district court viewed them." *Iko v. Shreve*, 535 F.3d 225, 234, 237 (4th Cir. 2008). But we lack jurisdiction to determine "whether or not the pretrial record sets forth a genuine issue of fact for trial." *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 275 (4th Cir. 2011) (cleaned up). Still, even under this narrow standard, we agree with Harris that the undisputed facts in the record don't amount to a constitutional violation.

## A.

Before examining legal issues, we first ask if there's a genuine issue of fact for trial, which would bar our jurisdiction. Putman claims there is, pointing out that the district court found that "the facts are in dispute as to whether Harris had a reasonable belief that

9

Putman may have been armed." *Putman*, 2022 WL 908937, at \*9. But although the district court's language suggests a fact issue, none exist.

No party disputes the material facts. It's not as if Harris and Putman offer conflicting versions of events, requiring a credibility determination by a jury. *See, e.g., Livingston v. Kehagias*, 803 F. App'x 673, 680–82 (4th Cir. 2020) (finding no appellate jurisdiction when the officers' arguments "rested entirely on disputed factual points"). Nor do the parties allege something occurred beyond the view of the bodycam that would affect the outcome. *See, e.g., Witt*, 633 F.3d at 277 (finding no appellate jurisdiction when the parties offered different accounts and the bodycam video didn't "blatantly contradict" or confirm either account).

Instead, the district court examined the undisputed facts—relying primarily on the bodycam video—and concluded that they didn't establish "whether Harris reasonably could have believed that Putman may have possessed a gun." *Putman*, 2022 WL 908937, at \*7. It's this legal judgment we examine.

Putman contends that the reasonableness of Harris's belief is a disputed fact that we can't review in this interlocutory appeal. But whether an officer's actions are "objectively reasonable" is a question of law, "without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. We don't consider Harris's subjective mental state, but judge "from the perspective of a reasonable officer on the scene." *Id.* at 396. Since our review is purely one of law, we have jurisdiction over Harris's appeal. *See Winfield v. Bass*, 106 F.3d 525, 529 (4th Cir. 1997) (en banc).

10

B.

Looking at the facts as the district court understood them, Harris committed no constitutional violation when detaining Putman, as he had probable cause for a mental-health seizure and a reasonable belief that Putman posed an immediate threat. While the district court relied on the bodycam video in denying summary judgment, our review of the totality of the circumstances demands reversal.

The bodycam footage doesn't tell the whole story, compelling as it may be. For instance, it doesn't show that Harris knew Putman had sent texts to his wife earlier in the day threatening to kill himself and stating he had a gun.[3] And even though Putman claimed he was unarmed during the encounter, Harris couldn't confirm this because Putman refused to turn around to show his entire waistband.

Even viewed in the light most favorable to Putman, we conclude a reasonable officer could have believed Putman was armed and thus posed an immediate threat. *Cf. Barrett*, 975 F.3d at 430–31 (officers' belief that plaintiff posed "a danger to herself and others," based largely on reports from her coworkers, was reasonable even though plaintiff told officers she didn't intend to harm anyone). And since this "immediate safety risk [was] reasonably likely to be cured by" using the dog, Harris's deployment was justified. *Armstrong v. Vill. Of Pinehurst*, 810 F.3d 892, 909 (4th Cir. 2016); *cf. Zuress v. City of*

---

[3] At oral argument, Putman's counsel claimed the officers didn't know if Putman wrote the texts. But Putman has never argued he didn't, and the fact that they came from Putman's phone allowed the officers to make the reasonable inference that Putman wrote them. In any event, the district court found it undisputed that Putman wrote the messages. *Putman*, 2022 WL 908937, at *1.

11

*Newark*, 815 F. App'x 1, 5 (6th Cir. 2020) (dog bite on a criminal suspect who may have been armed and was "not complying with the officers' commands [but instead] arguing, waving her hands around, turning to face the officers, and even reach[ing] for her waistband where a weapon could have been" wasn't excessive force).

The district court emphasized a difference between "immediate danger" and "imminent danger," noting that only the former justifies force that risks serious injury. *Putman*, 2022 WL 908937, at *9. Since Putman's initial resistance was non-violent—limited to abrasive language and refusing to comply with orders—the district court concluded that he didn't pose an "immediate" threat. *Id.* at *7.

The district court's view of things doesn't account for Putman's active resistance after the initial dog deployment. But even omitting that, we've noted before that force that risks serious injury "could be justified in some cases where an arrestee's non-compliance could be described as non-violent." *Armstrong*, 810 F.3d at 905 n.9. So long as there are "facts from which an officer could reasonably conclude that the resistance presents some immediate danger despite its non-violent character," such force is warranted. *Id.*

Those facts exist here. Putman's texts conveyed that he may have been armed. Given the heated argument, Putman's erratic arm movements, and his refusal to face away from the officers, Harris could reasonably fear that Putman might pull a hidden gun. It follows that Putman presented "an immediate threat to the safety of the officers." *Graham*, 490 U.S. at 396. Thus, Harris didn't violate Putman's Fourth Amendment rights when ordering the dog bite.

12

Putman points to cases such as *Armstrong*, which found that the use of a taser on an unarmed, but non-compliant individual constituted excessive force. 810 F.3d at 902. The significant differences between that case and the facts before us reveal why *Armstrong* is an inapt comparison.

Unlike here, the officers in *Armstrong* had no reason to suspect the individual was armed. *Id.* at 900. And the individual in *Armstrong* passively clung to a post, *id.* at 901, whereas Putman spoke aggressively, flung his arms about wildly, and refused to turn around to show the back of his waistband. Essentially, the officers in *Armstrong* couldn't reasonably perceive any "immediate danger." *Id.* at 903.

But here, Harris's belief that Putman had a firearm that he could have unexpectedly wielded was objectively reasonable. Thus, the dog bite was justified.

Our decision is based on the totality of the circumstances. The result might well be different had Putman remained stationary or kept his hands away from his waistband. But Putman's text conveying he was armed, combined with his aggressive and unpredictable behavior, reasonably suggested he was an immediate threat. On these facts, Harris's decision to deploy his K-9 wasn't "plainly incompetent." *Ashcroft*, 563 U.S. at 743.

During oral argument, Putman's attorney cited *Young v. Prince George's County*, 355 F.3d 751 (4th Cir. 2004), for the proposition that "just because a person is armed doesn't give the officers carte blanche to use any force." Oral Argument at 22:30, *Putman v. Harris* (4th Cir. Jan. 24, 2023) (No. 22-1360), www.ca4.uscourts.gov/OAarchive/mp3/22-1360-20230124.mp3. But in *Young*, an officer beat a compliant, handcuffed man (who turned out to be an FBI agent). 355 F.3d at 753–

13

54. Although the man was armed, he informed the officer about his gun and obeyed all commands. *Id.* Under those circumstances we couldn't "conclude as a matter of law that the force [in that situation] was reasonable." *Id.* at 757.

But here, unlike in *Young*, Putman wasn't complying with commands and Harris fairly believed Putman was armed. Those circumstances make Harris's actions reasonable.

Finally, Putman argues that the officers could have used other methods to deescalate the encounter, such as asking if Putman was suicidal and leaving if he answered no. Of course, had the officers done that and Putman then killed himself, we would likely have a different case before us. In any event, our charge is to assess only whether Harris's chosen conduct falls within "the range of reasonable judgment." *Gooden v. Howard Cnty.*, 954 F.2d 960, 965 (4th Cir. 1992). Once the officers made the fair call that Putman posed a danger to himself, they were "not required to walk away from the situation merely because [he] denied" he was suicidal. *Barrett*, 975 F.3d at 431 (cleaned up).

\*      \*      \*

In sum, while the bodycam video alone may not illuminate whether Harris had a reasonable belief that Putman was armed, the full record clarifies that this assumption was reasonable. Given that, Harris's use of his dog to seize Putman didn't violate the Fourth Amendment.

We therefore reverse the district court's denial of qualified immunity to Harris on the excessive-force count and remand with instructions that the court enter judgment for

14

Harris on that count.[4]  We leave it to the district court to resolve the remaining state-law claims.

*REVERSED AND REMANDED*

---

[4] Harris also argues that no reasonable officer would know his actions violated Putman's Fourth Amendment rights under clearly established law.  Since we have determined that Harris's actions were reasonable, we need not decide this issue. *Altman v. City of High Point*, 330 F.3d 194, 207 (4th Cir. 2003).